IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:09-cv-416

| | | |
|---|---|---|
| **JAMES LEWIS MORGAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| **GERALD BRANKER, Warden,** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**THIS MATTER** is before the Court upon James Lewis Morgan's Petition for Writ of

Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1). Also before the Court is

Respondent's Motion for Summary Judgment. (Doc. No. 16).

I.      **STATEMENT OF FACTS**

Morgan was indicted by a grand jury on January 5, 1998 for the November 26, 1997

murder of Patrina Lynette King. State v. Morgan, 604 S.E.2d 886, 891 (N.C. 2004). He was

tried before a jury during the June 21, 1999 Criminal Session of the Buncombe County Superior

Court, the Honorable James U. Downs presiding. The State's evidence was summarized by the

North Carolina Supreme Court as follows,

> [D]efendant and his nephew, Kenneth Cato (Cato), were living at 13 Ridge Street
> in Asheville. On the evening of 25 November 1997, Cato arrived home around
> midnight to find defendant and King sitting in the living room. They appeared to
> him to have been smoking crack cocaine, and Cato heard defendant tell King that
> he wanted a "head job." When King refused and tried to depart, defendant started
> shouting and smacked her. Defendant also grabbed a beer bottle by the neck,
> threatened Cato with it, and ordered him to leave. Although Cato stepped out of
> the room, defendant continued hitting King. Cato told defendant to stop, then
> reentered the room and began to wrestle with defendant. During their struggle,
> defendant hit Cato on the head with the beer bottle, then chased Cato outside and

around a vehicle parked on Ridge Street. According to Cato, defendant was holding a knife during the chase. Meanwhile, King emerged from the house and started down the street. When defendant began to follow her, Cato ran for help to the home of defendant's brother, Richard Morgan (Rick), about a half mile away.

The two drove back to Ridge Street, where Cato saw a broken bottle in the street and King lying between two cars. Rick knocked on the door of Stacey Miller's home at 12 Ridge Street and asked him to call 911. Unable to comply because he did not have a telephone, Miller stepped outside to see what was happening. Defendant returned to the scene, carrying a knife. Miller saw defendant, Rick, and Cato standing together, engaged in conversation. Defendant said, "You-all are the reason why this happened to me," and chased Cato around the car shouting either "I'll kill you, too" or "I should have killed you." Someone called 911, and defendant walked away when police arrived at the scene.

Shortly before 2:00 a.m. on 26 November 1997, Sergeant Mike Hahn of the Asheville Police Department, driving a Chevrolet Blazer, responded to a call requesting police assistance on Ridge Street. As Sergeant Hahn approached the scene, he observed a black male in dark clothing walking in the opposite direction. Sergeant Hahn then came upon a Chevrolet Monte Carlo parked on the wrong side of the road. He exited his vehicle and found King lying on her stomach with her shoulders and head under the rear of the Monte Carlo. Her jeans and underwear were pulled down and a sheet or curtain partially covered her body. The entire area behind the car was covered with blood and broken glass, although no knife was found at the scene. As Sergeant Hahn began to assess King's condition, he noticed Cato and Rick and heard Cato say, "You just drove right by him." EMS personnel arrived at the scene and King was transported to a nearby hospital, where doctors performed emergency surgery in an unsuccessful attempt to save her life.

Forest Weaver, a detective in the Criminal Investigations Division of the Asheville Police Department, went to Ridge Street around 9:00 a.m. on 26 November 1997. He found defendant hiding in the basement of 20 Ridge Street. Once defendant emerged, he was handcuffed and transported to the Asheville Police Department.

Willie Albert Jones, an inmate at the Buncombe County Jail, shared dormitory space in the jail with defendant. Jones testified that defendant told everyone in earshot about the murder, saying the victim used his drugs but would not give him sex. Defendant also wrote and sang a rap song about the murder. Jones recalled that the words of the song were "You shouldn't have done what you done ... smoke my rock, wouldn't give me none, you know, and I went and did what I did ... I told you once, I told you twice, that you are going to have to pay the sacrifice ... with your life." Another inmate, Eddie Oglesby, similarly testified that defendant sang about the killing and told Oglesby that he slashed the victim.

2

According to Oglesby, defendant told him that the victim would not give him oral sex after smoking defendant's cocaine and that, in frustration, defendant hit the victim on the back of the head with a bottle and stabbed her.

Donald Jason, M.D., the forensic pathologist who performed the autopsy on King, testified that she suffered a total of forty-eight wounds to the face, head, back, buttocks, and upper back of her legs. Dr. Jason was of the opinion that King bled to death because of multiple stab and incised wounds caused by ['[a sharp object. These wounds are not consistent with typical knife wounds. They are all different sizes, shapes, irregular, fairly shallow. But some other type of sharp object such as something made out of glass that has a broken, sharp edge, or broken sharp edges of varying sizes and shapes.[']

Morgan, 604 S.E.2d at 891-892.

The jury also heard from Abraham Adams, who testified that in 1992, Morgan had twice assaulted him because Adams had not paid Morgan the dollar that he owed him. On the first occasion, Morgan struck Adams in the head with a beer bottle, leaving glass imbedded in his scalp. According to Adams, Morgan had been drinking before the first fight, and although Adams could not say whether Morgan had been drinking before the second fight, he testified that Morgan was holding a beer bottle when the fight started. (Trial Tr. at 1441-1454).[1]

Morgan testified on his own behalf and claimed that he acted in self-defense. Morgan, 604 S.E.2d at 892-93. According to Morgan,

he and King drank beer and smoked cocaine the evening of 25 November 1997. When Cato arrived later that evening, he gave defendant some crumbs of crack cocaine. King, who wanted more, began "screaming and hollering" when defendant declined to share the crumbs. Cato offered to let King use his pipe, and then both she and Cato asked defendant to buy more cocaine. Defendant refused because he wanted to save the rest of his money for his daughter. Defendant pulled his money out of his pocket and Cato snatched it away from him. When defendant attempted to retrieve it, King hit defendant over the shoulder with a beer bottle. As defendant turned to grab the bottle away from King, Cato

---

[1]Citations to transcripts are to the official transcripts from Morgan's trial beginning on June 21, 1999 at the Criminal Session of the Buncombe County Superior Court and from several pretrial hearings. Respondent filed the transcripts manually with the Court's permission.

3

> approached defendant from behind and put him in a choke hold.  Defendant hit
> Cato with the beer bottle in an unsuccessful attempt to free himself.  Cato pulled a
> .25 automatic pistol from his pocket, placed it against defendant's head, and
> pulled the trigger.  When the gun failed to fire, defendant reached for a knife that
> was on the table in front of him and Cato ran out the door.  Defendant followed
> Cato and chased him around a car but could not catch him.  Defendant stopped to
> catch his breath, and King hit him from behind with a beer bottle.  The two began
> to fight in the middle of the street.  According to defendant, ['][King] would
> swing the bottle, I would swing the knife.  It was rough.[']

Id.. Morgan described himself as being surprised by his companions' actions and denied any

memory of what happened between himself and Ms. King after they began fighting in the street.

(Trial Tr. at 1560, 1565).  He denied any memory of stabbing Ms. King.  (Id. at 1565-66).

Morgan testified that he could not understand how things had gotten so complicated so quickly

and that he was just reacting and overreacting to the others' aggressive acts.  (Id. at 1563, 1565-

66).  He recalled asking Cato, after he had returned to the scene with Rick, "Why, why did you –

all do that?"  (Id. at 1563).  He also acknowledged that he was addicted to crack cocaine and

alcohol.  (Id. at 1553).  Morgan testified that the incident had nothing to do with sex and denied

that he ever sang a song about the murder while in custody.  Morgan, 604 S.E.2d at 893.

Counsel argued in closing that Patrina King's death was the tragic outcome of a fight over

money and cocaine between three people who were high on crack and that Morgan's acute

intoxication caused him to overreact and use excessive force when defending himself from a

physical attack by Ms. King.  (Trial Tr. at 1626-1642).

The trial court instructed the jury on first-degree murder, second-degree murder, and

voluntary manslaughter.  (Id. at 1665-75).  The jury found Morgan guilty of first-degree murder

on the basis of premeditation and deliberation.  Morgan, 604 S.E.2d at 891.

A capital sentencing proceeding was held at which the State presented evidence of

Morgan's prior convictions for second-degree murder in North Carolina and robbery (sudden

4

snatch) in Georgia.  The defense called a number of Morgan's friends and family members who testified about Morgan's good qualities and their relationships with him.

Morgan's brother, Robert, and sister, Jené, testified that the family grew up poor and that at age nine, Morgan began working to help support the family.  They testified that Morgan had a bed wetting problem until he was in his mid to late teens, and that because there was little hot water in the home to use for washing, he often went to school smelling of urine.  He was teased and ridiculed at school because of the way he smelled.  (Trial Tr. at 1782-91, 1834-1849).

The siblings also testified about Morgan's relationship with his family.  Robert and Morgan's other brother, Rick, each recalled a specific act of kindness and generosity Morgan had made as a child that created a lasting memory for them.  Robert recalled that despite their poverty, Morgan had spent his last nickel to buy Robert one of his favorite toys.  Rick testified that when Morgan was given a pair of roller skates, he took them apart and made two skateboards so that he and Rick both would have something to play with.  Rick also testified that it was Morgan who taught him to play basketball, football, and baseball.  (Id. at 1782-99, 1825-34).

Robert testified that because his 20 year career in the Air Force kept him away from his family for long periods of time, Morgan had stepped in and helped raise his children, two of whom had joined the Asheville Police Department.  When he got out of prison in 1990, Morgan returned home and lived with and cared for their elderly parents, including their invalid father until he died some four years later.  (Id. at 1782-99, 1834-49).

Jené, a single mother, testified that Morgan had a positive influence on her two sons. Morgan taught the oldest, LaRon, how to drive and his younger brother how to tie his shoes. Morgan also prevented LaRon from retaliating against some men who had threatened him with a

5

gun on a previous occasion. She testified that Morgan helped her out at home with cleaning and yard work without her asking and without asking for payment. (Id. at 1834-49).

His nephew, Randy Caldwell, an Asheville police officer, testified that it was Morgan who helped him get his driver's license after he had tried unsuccessfully for two and a half years to get it. (Id. at 1082-1805). Another nephew, Charles Williams, also an Asheville police officer, testified that Morgan had prevented him from hunting down a man who had pulled a gun on him. Morgan, who learned of Charles's intention to get his own gun and go after the man, took Charles's car keys away from him, drove him home, and made him stay there. Later, when he returned Charles's keys, Morgan explained that he was not going to let Charles go down the same road that he had. Although angry at first, Charles later understood that his uncle not only had saved the other man's life, he had saved Charles from going to prison and possibly ending up on death row himself. (Id. at 1799-1802).

The family was aware of Morgan's drug and alcohol problems. Robert, who acknowledged having been through "rehab" while in the Air Force, testified that he had talked to Morgan in the past about his drug and alcohol problems. Rick testified that Morgan had tried to quit drinking several times and had managed to stay sober for a year after he was released from prison. Rick testified that it was a good year for Morgan and the family. He testified further that he and Morgan had talked many times about his problem with alcohol. (Trial Tr. at 1782-99, 1825-34).

His siblings also testified that Morgan was consistently employed. Rick testified that he did construction and carpentry work for two local men, and Robert testified that Morgan always kept a job because he knew he had to pay his own way. During the guilt phase, Morgan testified that he had worked on a construction job the day that Patrina King was killed. Rick testified that

6

he had invited Morgan to live in the Ridge Street home, which had been abandoned for years, and that Morgan paid the bills for the home. (Id. at 1782-99, 1825-34).

The jury also heard from Yolanda Conyers, Morgan's ex-girlfriend and the mother of his seven year-old daughter, Jakara. Ms. Conyers, a social worker, knew Morgan in highschool, but they did not begin to date until shortly before he was released from prison in 1990. After his release, they continued to date and eventually began living together. Ms. Conyers testified that Morgan was employed during this time, and she described him as a proud and loving father to Jakara. She also testified that the family attended church together every Sunday, and Morgan sang in the choir. The couple became estranged in 1992, but Morgan maintained a close relationship with Jakara, including giving her money and spending time with her. He sometimes also took care of Jakara's half-siblings, although they were not his own children. Morgan was supposed to have met Ms. Conyers and Jakara at a Christmas parade the day Ms. King was killed. (Id. at 1743-53).

Several witnesses testified about Morgan's religious faith and involvement in the Nazareth First Baptist Church in Asheville. Dr. Charles Mosley, who at the time of trial had served as the church's pastor for 24 years, testified that he had known Morgan's family since Morgan was a child. Prior to his release from prison, Morgan received weekend passes home, and attended worship services and Bible study classes at Nazareth on those weekends. He also sang in the choir. After his release from prison, Morgan and Ms. Conyers regularly attended church with their daughter, and Morgan continued to sing in the choir. He was generally accepted by the congregation and related well to the children in the church. Dr. Mosley believed that despite his many mistakes, Morgan was a Christian. He opined that an open letter Morgan had written to the congregation after the murder reflected that he was repentant. Dr. Mosley also

7

believed that Morgan could be a good mentor to young men and boys in the prison system. (Id. at 1718-43).

Reverend William Ray, the pastor at Welfare Baptist Church in Asheville, and Morgan's childhood friend, and Mary Ellen Dawkins, a retiree of the Clerk of Court's Office, and the director of the Nazareth First Baptist Church choir, also testified on Morgan's behalf. Reverend Ray testified that Morgan was a kind person who had a gift for connecting with children. He testified that he had counseled Morgan about his drug and alcohol problems since his release from prison and that he considered Morgan's embrace of church life a blessing. He also testified about the painful effect the King killing was having on Morgan's family, especially his sister, Jené. (Id. at 1764-77). Ms. Dawkins described Morgan's enthusiastic participation in the choir and testified that he seemed to really enjoy coming to church. She also testified that in his letter to the church, Morgan asked that she wave in the direction of the jail on her way to and from work because the inmates could see the parking lot where she parked. (Id. at 1777-82).

Phyllis J. Sherrill, who grew up in the same community as Morgan and knew his family, gave similar testimony regarding Morgan's post-incarceration church involvement. Ms. Sherrill sang with Morgan in the choir, and she testified that his ambition was to be a successful rapper. Ms. Sherrill also believed that Morgan truly was remorseful and that he could be redeemed or "saved." Like Reverend Ray, she described the impact Morgan's crime was having on his family. (Trial Tr. at 1806-1819).

The jury also heard from two of Morgan's Ridge Street neighbors. Both described him as polite and helpful to them and to others in the neighborhood, including an elderly man, for whom Morgan trimmed hedges and did other small jobs. One neighbor, Ms. Vicky Green, testified that Morgan took care of her yard for her, and the other, Ms. Melana Ryans, testified

that he had fixed a fence in her yard without asking for payment. Ms. Ryans also testified that

Morgan did a number of carpentry and construction projects for her and that he always charged

her less than others who had done similar work. Both Ms. Green and Ms. Ryans knew of

Morgan's desire to enter the music business, and Ms. Green testified that she and her 12 year-old

daughter called Morgan "Jimmy Jam" because he liked to rap. Ms. Green testified further that

she and her daughter had become friends with Morgan and that she trusted him. Morgan was

protective of her daughter and had confronted some men in the neighborhood about their

behavior around the child. She also felt safe in her home because Morgan lived across the street,

and she knew he was keeping an eye on her and the house. (Id. at 1753-64, 1819-24).

Prosecutors focused their closing arguments on the brutality of Ms. King's murder and

the fact that Morgan had killed before. Prosecutors also argued that jurors should not

recommend life imprisonment out of sympathy for Morgan's family. Defense counsel, on the

other hand, hammered home the family sympathy theme:

> What of his family? How will knowing about it, and reading about it, waiting for
> it, thinking about it, being reminded of it, and possibly even attending his
> execution, how will it affect them? If you don't sentence Jimmy Morgan to life
> in prison without parole for him, do it for Ricky, do it for Jené, do it for Robert,
> do it for their children, do it for Jakara.

(Trial Tr. 1901).

> [Y]ou heard family member after family member and church member after
> church member sit right here and talk to you about what Mr. Morgan meant to
> them in their lives. The District Attorney . . . has downplayed that. You
> remember what each and every one of these good family members and church
> members told you about how their lives have been so positively affected by Mr.
> Morgan.

(Id. at 1904).

> [T]his District Attorney said to you that procreation is not mitigation. Well, I
> submit, he must have no family of his own to argue that to each and every one of

9

you.

> The very reason that you should hand down a sentence of life without parole may not be so much as what Mr. Morgan will have to go through each and every day, but the reason you should do that should be to benefit the one thing that James Morgan did perfectly, the one thing that he did, and that was the birth of his daughter. You heard how each and every member from the church, his family, the daughter's mother talk about what a strong love this man had for that child and what a strong love and bond this child has for her father. The District Attorney can make light of that. Family is important.

(<u>Id.</u> at 1905).

> Consider all of the factors in mitigation that will be before you, and consider these fine people that have told you things about James Morgan.

> But, members of the jury, consider that precious little girl. Let's not kill a part of her heart and her life by ordering the death of her daddy.

(<u>Id.</u> at 1906).

The Court instructed the jury on two statutory aggravating circumstances, three statutory mitigating circumstances and 24 non-statutory mitigating circumstances. (Doc. No. 3-5, Habeas Pet. App. A.14: Pet'r's MAR Ex. 48).[2] The jury found both aggravating circumstances – that the defendant previously had been convicted of a felony involving the use or threat of violence to the person, N.C. Gen. Stat. § 15A-2000(e)(3), and that the murder was especially heinous,

---

[2]Morgan filed three Appendices – A, B, and C (Doc. Nos. 1-1 thru 6-3) – with his Petition for Writ of Habeas Corpus (Doc. No. 1). Appendix A consists of Morgan's state Motion for Appropriate Relief and all of its supporting exhibits. This Court's electronic filing system (CM/ECF), however, breaks large filings into smaller increments. For example, Appendix A has been broken into 17 documents, each of which has been identified as a subset of Appendix A (e.g. App. A.1). Each document contains one or more exhibits. To keep citations from becoming too unwieldy, the first citation to each document will begin with the CM/ECF docket number followed by the appendix number, if relevant. Next will be Petitioner's or Respondent's exhibit number, followed by a pinpoint cite, if needed. All subsequent citations will include only the docket and exhibit numbers, followed by pinpoint citations.

atrocious and cruel, id. at § 15A-2000(e)(9).  (Doc. No. 3-5: MAR Ex. 48 at 56-57).[3]  The jury

also found two of the statutory mitigating circumstances – that the murder was committed while

the defendant was under the influence of a mental or emotional disturbance, N.C. Gen. Stat. §

15A-2000(f)(2), and that the capacity of the defendant to appreciate the criminality of his

conduct or to conform his conduct to the requirements of the law was impaired, id. at § 15A-

2000(f)(6), – and six non-statutory mitigating circumstances.  (Doc. No. 3-5: MAR Ex. 48 at 57-

62).  On July 8, 1999, the jury recommended that Morgan be sentenced to death.  Morgan, 604

S.E.2d at 891.  Judge Downs entered judgment accordingly.  Id.

## II.    PROCEDURAL HISTORY

### A.    DIRECT APPEAL

Morgan's conviction and sentence were affirmed on direct review.  Id. at 912.

Subsequently, the United States Supreme Court denied Morgan's Petition for Writ of Certiorari.

Morgan v. North Carolina, __ U.S. __, 126 S. Ct. 47 (2005).

### B.    STATE POST-CONVICTION PROCEEDINGS

Morgan filed a Motion for Appropriate Relief ("MAR") in the Buncombe County

Superior Court on July 17, 2006.  (Doc. Nos. 1-1 thru 1-3, Habeas Pet. App. A.1: MAR).

Among the claims raised was that trial counsel rendered ineffective assistance by failing to

investigate and present additional mitigating evidence at sentencing.  Specifically, Morgan

argued that the evidence that was presented inaccurately portrayed his childhood, which was

violent and chaotic, and omitted critical evidence that he is brain-damaged and had been a

substance abuser since childhood, that his siblings also were substance abusers and had criminal

---

[3]Unless otherwise indicated, the page numbers in docket citations are those assigned by
CM/ECF.

records, that he had a positive history of employment and adjustment to incarceration, and that he was a low risk for future dangerousness if sentenced to life in prison.  (Id.).

Morgan's post-conviction evidence tended to show that his father had a violent temper and physically abused all of his children, beating them severely enough to leave marks and causing at least two to fear that he eventually would kill one of them.  (Doc. No. 1-5, Habeas Pet. App. A.3: Pet'r's MAR Ex. 1 at ¶¶ 7-8, MAR Ex. 2 at ¶ 8; Doc. No. 2, Habeas Pet. App. A.4: Pet'r's MAR Ex. 5 at ¶ 3; Doc. No. 2-2, Habeas Pet. App. A.6: Pet'r's MAR Ex. 12 at ¶ 14).  According to Jené, their father treated his dogs better than he did his children and once threatened a neighbor with a shotgun after she had complained to police that one of his dogs had bitten her child.  (Doc. No. 1-5: MAR Ex. 2 at ¶ 10).  Morgan received the worst beatings because he broke more rules than his siblings, and his strange behavior infuriated their father.  (Doc. No. 1-5: MAR Ex. 1 at ¶ 10, MAR Ex. 2 at ¶ 9; Doc. No. 2: MAR Ex. 5 at ¶ 8).  Moreover, when his parents were not at home, Robert, the oldest of the children, fought with and beat his siblings, including Morgan.  (Doc. No. 1-5: MAR Ex. 2 at ¶ 11; Doc. No. 2: MAR Ex. 5 at ¶ 6).

Morgan's evidence also showed that he had a history of head injuries.  On October 15, 1964, when he was nine years-old, Morgan fell from the tailgate of a moving station wagon and struck his head.  (Doc. No. 1-5: MAR Ex. 1 at ¶ 13, MAR Ex. 3).  Medical records from Memorial Mission Hospital in Asheville show that Morgan had a "swollen area on the back of [his] head," and that family members reported that he was unconscious for 30 minutes after the fall.  (Doc. No. 1-5: MAR Ex. 3 at 15).  When Morgan was 15, Robert hit him in the head with a baseball bat and "knocked the hell out of him[.]"  (Doc. No. 1-5: MAR Ex. 1 at ¶ 15; Doc. No. 2: MAR Ex. 5 at ¶ 13).  Additionally, Memorial Mission Hospital records from 1990 show that a

thirty pound television fell on Morgan's head during his incarceration for second-degree murder. (Doc. No. 2-1: MAR Ex. 6).

Family and friends noticed a change in Morgan after his fall from the station wagon. (Doc. No. 1-5: MAR Ex. 1 at ¶ 13, MAR Ex. 2, ¶ 12; Doc. No. 2: MAR Ex. 4 at ¶ 14, MAR Ex. 5 at ¶ 11). His behavior became erratic and bizarre at times (Doc. No. 3-2, Habeas Pet. App. A.11: Pet'r's MAR Ex. 36), and he often seemed unfocused and out of touch with what was going on around him (Doc. No. 1-5: MAR Ex. 2 at ¶ 14; Doc. No. 2-1: MAR Ex. 10 at ¶ 6). When he spoke, he often rambled and jumped from subject to subject. (Doc. No. 2-1: MAR Ex. 10 at ¶ 7). He also was impulsive and behaved inappropriately in public. (Doc. No. 1-5: MAR Ex. 1 at ¶¶ 19-20; Doc. No. 2: MAR Ex. 4 at ¶¶ 18, 30-31).

Morgan was a frequent object of ridicule for his behavior, and people in the community thought he was "afflicted." (Doc. No. 3-2: MAR Ex. 36). His family thought that he had mental problems and considered him "strange," "childlike," "an oddball," and "slow." (Doc. No. 1-5: MAR Ex. 1 at ¶ 13, MAR Ex. 2 at ¶ 12; Doc. No. 2: MAR Ex. 5 at ¶ 11; Doc. No. 2-1: MAR Ex. 8 at ¶ 6, MAR Ex. 9 at ¶5, MAR Ex. 10 at ¶ 6). Morgan's high school principal believed that Morgan was in "need of psychiatric help during the time that he was enrolled in Asheville High School" (Doc. No. 2-1: MAR Ex. 7 at ¶ 5), and at least two siblings considered having him committed so that he could get professional help (Doc. No. 1-5: MAR Ex. 2 at ¶ 29; Doc. No. 2: MAR Ex. 5 at ¶ 19). Robert indicated, however, that had they done so, Morgan would not have understood or appreciated their actions because he did not recognize that he had problems and always found ways to rationalize his behavior or blame others when things went wrong. (Doc. No. 1-5: MAR Ex. 1 at ¶ 25).

Morgan also had difficulty controlling himself. (Doc. No. 2: MAR Ex. 4 at ¶¶ 18-19, 29;

Doc. No. 2-1: MAR Ex. 8 at ¶ 3; Doc. No. 2-2: MAR Ex. 12 at ¶ 18). According to one family member, every emotion for Morgan — "anger, joy, sadness, etc.—was extreme." (Doc. No. 2.1: MAR Ex. 8 at ¶ 3). He had a "bad temper" and appeared to his family to be unable to control it. (Doc. No. 2: MAR Ex. 4 at ¶¶ 14, 18-19, 31). His family members believed that once he "snapped," Morgan was capable of hurting someone and that his erratic behavior was even less predictable when he was intoxicated or high. (Id. at ¶¶ 13, 41, 50). According to Rick, he had to pull a gun more than once when Morgan lost control because it was the only thing that got his attention. (Id. at ¶ 22). Robert also indicated that sometimes the only way to get Morgan to calm down was to use force. (Doc. No. 1-5: MAR Ex. 1 at ¶ 19).

Morgan's evidence showed that his social skills developed slowly and that he was easily led into trouble by others. (Doc. No. 1-5: MAR Ex. 2 at ¶ 12; Doc. No. 2: MAR Ex. 5 at ¶ 14). When he was 12, Morgan joined a gang of adolescent boys from the neighborhood. (Doc. 2-2: MAR Ex. 12). According to one of Morgan's close childhood friends, a former leader of the gang, the boys in the gang "weren't very nice kids. We fought a lot and drank a lot. We robbed people, broke into places and stole stuff. Things you just don't want your kids to be doing." (Id. at ¶¶ 4-7). Morgan, according to his friend, was not smart enough to be a leader of the group; he was always a follower. (Id. at ¶ 7).

Morgan's drug and alcohol addictions began during this period of early adolescence. (Doc. No. 1-5: MAR Ex. 1 at ¶¶ 23-25, MAR Ex. 2 at ¶¶ 20-22; Doc. No. 2: MAR Ex. 5 at ¶¶ 28-30). The gang members drank heavily and used whatever drugs they could get their hands on. (Doc. 2-2: MAR Ex. 12 at ¶ 12). By the time Morgan was fourteen years old, he was injecting heroin to get high, often using it "everyday for weeks at a time." (Id. at ¶ 14). Morgan's substance abuse became worse as he entered adulthood, and his crack cocaine

14

addiction magnified his already erratic behavior. (Doc. No. 1-5: MAR Ex. 1 at ¶¶ 23-25, MAR Ex. 2 at ¶¶ 20-22; Doc. No. 2: MAR Ex. 5 at ¶¶ 28-30; Doc. 2-2: MAR Ex. 12). According to the former gang-leader, he knew when Morgan was on crack because "it was a different kind of erratic behavior than the sober 'crazy Jimmy.'" (Doc. 2-2: MAR Ex. 12 at ¶ 16).

Morgan's evidence also showed that the Morgan family had a history of alcohol abuse. Morgan's father was a heavy drinker, and Morgan's half-brother, George, was an alcoholic. (Doc. No. 1-5: MAR Ex. 1 at ¶¶ 23-25; Doc. No. 2-2: MAR Ex. 13 at ¶ 9). Robert was twice ordered to obtain treatment for alcohol abuse while he was in the military, and he had convictions for Driving While Impaired and for having an open container of wine or liquor in the passenger area of his car. (Doc. No. 1-5: MAR Ex. 1 at ¶¶ 23-35; Doc. No. 3-5: MAR Ex. 47). Rick had three convictions for Driving While Impaired and a conviction for an open container of wine or liquor in the passenger area of a vehicle. (Doc. No. 3-5: MAR Ex. 46).

Rick and Robert also had violent tempers like Morgan and their father. Rick had convictions for Assault on a Female, Injury to Real Property, Assault on a Law Enforcement Officer, Communicating Threats, and Simple Assault. (Id.). Robert, as previously noted, beat his siblings when they were growing up and stabbed at least two people as a teenager. (Doc. No. 1-5: MAR Ex. 1 at ¶ 16).

Dr. Kristine Herfkens, PhD., a clinical neuropsychologist, was hired by post-conviction counsel to perform a neuropsychological assessment of Morgan and determine whether childhood traumatic brain injury or other factors diminished his culpability for the murder of Patrina King. (Doc. No. 2: MAR Ex. 4 at ¶¶ 3-4). Dr. Herfkens conducted a battery of tests on Morgan, and reviewed family and friend interviews, Morgan's medical, school, criminal, and incarceration records, as well as the investigative reports from the King murder. (Id. at ¶¶ 5-6).

15

Dr. Herfkens concluded that Morgan suffered from severe neurocognitive impairments consistent with moderate to severe brain injury, specifically the ability to read social cues, use good judgment, exercise self-control, and understand complex, quickly-developing situations. (Id. at ¶¶ 40, 48). Dr. Herfkens also concluded that Morgan's neurocognitive impairments were exacerbated by his years of substance abuse, particularly as an adolescent, and his exposure to chronic physical abuse and violence. (Id. at ¶ 43). According to Dr. Herfkens, alcohol damages the frontal areas of the adolescent brain, crucial for controlling impulsivity and decision-making, more severely than it does the adult brain. (Id.). Moreover, according to Dr. Herfkens, children who are abused, or who are long-term witnesses of abuse, have smaller brains than their peers and demonstrate permanent changes in brain structures critical to planning, anticipating consequences, attention, motivation, and correctly identifying social cues and nonverbal behavior. (Id. at ¶ 15).

It was Dr. Herfken's opinion that at the time of the murder, Morgan was a chronic alcoholic and drug addict and that he was predisposed to substance abuse and dependence because of his family history of substance abuse. ((Doc. No. 2: MAR Ex. 4 at ¶ 41). Moreover, it was her opinion that due to the effects of traumatic brain injury, exposure to childhood abuse and violence, chronic alcohol dependence, and acute intoxication, Morgan "was unable to inhibit his impulses, appreciate the criminality of his actions and conform his conduct to the requirements of the law" at the time of Patrina King's murder. (Id. at ¶ 53).

Post-conviction counsel secured an affidavit from one of Morgan's trial attorneys, Bruce Elmore, stating that an opinion based on neuropsychological or neuropsychiatric testing that Morgan suffered from brain damage would have been helpful to the diminished capacity defense at trial, as well as sentencing. (Doc. No. 3-2: MAR Ex. 35 at ¶ 19). He stated further that had he

16

had such an opinion, he would have presented it to the jury.  (Id.).

Finally, there was evidence that Morgan had a positive employment history after he was paroled in 1990 and that he had demonstrated a positive adjustment to prison while incarcerated. Morgan worked for two construction companies and both employers described him as hard-working and reliable.  (Doc. No. 3-5: MAR Ex. 50 at ¶3; MAR Ex. 51 at ¶4).  Additionally, Morgan's prison records indicate that during the 14 years that he was incarcerated for second-degree murder, he regularly earned down-grades in security status and eventually was approved for work-release and home-leave passes.  (Doc. No. 2-5, Habeas Pet. App. A.8: Pet'r's MAR Exs. 16-17; Doc. No. 3, Habeas Pet. App. A.9: Pet'r's MAR Exs. 18-22).  According to the records submitted with his MAR, Morgan incurred only six infractions over 14 years.  (Doc. No. 3: MAR Exs. 19-20).

According to Dr. Herfkens, the absence of alcohol and drugs in prison had enabled Morgan to better control his impulses.  (Doc. No. 2: MAR Ex. 4 at ¶ 52).  It was her opinion that Morgan was unlikely to pose a threat to other prisoners or guards if sentenced to life-imprisonment because the rigid structure of prison would enable him to avoid situations that had triggered his temper in the past.  (Id.).

The State filed an Answer (Doc. Nos. 4-1 thru 4-2, Habeas Pet. App. C.1) with exhibits (Doc. Nos. 4-3 thru 6-2, Habeas Pet. App. C.2 – C.5) opposing the MAR and a Motion for Summary Denial on the Pleadings (Doc. No. 6-3, Habeas Pet. App. C.6).  On December 29, 2008, the MAR court denied Morgan's MAR by written order and without an evidentiary hearing.  (Doc. No. 4, Habeas Pet. App. B).  Morgan filed a Petition for Writ of Certiorari in the North Carolina Supreme Court, which was denied on August 27, 2009.  State v. Morgan, 683 S.E.2d 380 (N.C. 2009).

17

### C. § 2254 PETITION

On November 13, 2009, Morgan filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1). Morgan claims that he received ineffective assistance of counsel with respect to his capital sentencing proceeding. (Id.) Specifically, Morgan contends that trial counsel failed to conduct an adequate mitigation investigation and present evidence that his history of traumatic brain injuries and substance abuse caused significant brain damage, which affected his judgment and ability to respond rationally to stressful situations, like the one leading to the murder of Patrina King. (Id.) Morgan also contends that counsel failed to investigate and present evidence that he had a violent and chaotic childhood and that he had had a positive adjustment to incarceration. (Id.). Morgan seeks an evidentiary hearing before this Court to allow him to present evidence to support his claim. (Doc. No. 1 at 69).

The State filed a Response (Doc. No. 15) and a Motion for Summary Judgment (Doc. No. 16). Morgan subsequently filed a Reply to the Response and an Answer to the Motion for Summary Judgment. (Doc. No. 21). The issues have been fully briefed, and this matter is ripe for disposition.

## II. STANDARD OF REVIEW

Morgan's claims alleging ineffective assistance of counsel were adjudicated on their merits by the MAR court. Therefore, this Court's review is limited by the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, as construed by the Supreme Court in Williams v. Taylor, 529 U.S. 362 (2000). The Court may grant habeas relief on claims of constitutional error adjudicated on their merits in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A state court decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result][.]"  Williams, 529 U.S. at 405; Lewis v. Wheeler, 609 F.3d 291, 300 (4th Cir. 2010) (quoting Williams, 529 U.S. at 405)).  A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case."  Williams, 529 U.S. at 407; Lewis, 609 F.3d at 300-301 (stating also that a state court unreasonably applies federal law when it "extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply[ ]") (citation and quotation marks omitted).

"[A]n unreasonable application of federal law is different from an incorrect application of federal law" for § 2254(d)(1) purposes.  Williams, 529 U.S. at 410.  The former requires a "substantially higher threshold" to obtain relief than does the later.  Schiro v. Landrigan, 550 U.S. 465, 473 (2007).  A state court's determination that a claim fails on its merits cannot be overturned by a federal habeas court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

A habeas court, therefore, must "determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the

19

holding in a prior decision of th[e Supreme] Court." <u>Richter</u>, 131 S. Ct. at 786. A petitioner has the burden of establishing that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-787.

## III.   DISCUSSION

### A.   APPLICABLE LAW

The clearly established federal law governing Morgan's habeas claim is <u>Strickland v. Washinton</u>, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, a prisoner challenging his conviction or sentence must show both that counsel's performance was deficient and that he was prejudiced as a result. <u>Strickland</u>, 466 U.S. at 687; <u>Williams</u>, 529 U.S at 390 (applying <u>Strickland</u> principles to claims of ineffective assistance of counsel at sentencing). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 686.

An analysis of counsel's performance must begin with a presumption by the reviewing court that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S. Ct. 1388, 1403 (2011) (quoting <u>Strickland</u>, 466 U.S. at 690). To overcome that presumption and establish deficient performance, the defendant must show "that counsel failed to act 'reasonabl[y] considering all the circumstances.'" <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 688); <u>Rompilla v. Beard</u>, 545 U.S. 374, 380 (2005) (stating that, under <u>Strickland</u>, counsel's performance is "measured against an objective standard of reasonableness, under prevailing professional norms") (citations and internal quotation marks omitted). When the more highly

20

deferential § 2254(d) standard is applied, the petitioner must demonstrate that there is "[no] reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 131 S. Ct. at 788.

To establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. It is not enough, however, "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be substantial enough "to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Morgan raised his ineffectiveness claim as Claim I of his MAR. (Doc. Nos. 1-1 thru 1-3). The MAR court denied this claim on the merits, correctly identifying Strickland as the clearly established Supreme Court precedent governing ineffective assistance of counsel claims. (Doc. No. 4 at 4).[4] The question before this Court, therefore, is whether the MAR court's application of Strickland "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786–87.

---

[4]In its conclusion, the MAR court made a blanket statement that the claims raised in the MAR were procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) and, in the alternative, were without merit. (Doc. No. 4 at 49). However, the court's analyses of the ineffective assistance claims themselves show no reliance upon procedural bar and are strictly merits reviews. (Id. at 4-34). Notably, Respondent has not raised procedural bar as a defense to the ineffective assistance claim raised in the Petition. The Court finds, therefore, that the MAR court adjudicated Petitioner's ineffective assistance of counsel claims solely on their merits.

**B.      COUNSEL'S PERFORMANCE**

In his MAR, Morgan asserted that counsel performed deficiently by failing to investigate and present evidence that he was brain-damaged and had been a substance abuser since childhood, that his siblings also were substance abusers and had criminal histories, that he had a positive history of employment and adjustment to incarceration, and that he was a low risk for future dangerousness if sentenced to life in prison.  (Doc. Nos. 1-1 thru 1-3).  Morgan also faulted counsel for failing to hire a neuropsychologist who could have determined that he was brain damaged and explained to the jury the significance of his adolescent substance abuse and later addiction.  (Doc. No. 1-1 at 26-30; Doc. No. 1-2 at 1).  Finally, Morgan contended that the evidence that was presented at sentencing inaccurately portrayed his childhood and that counsel should have given the jury an accurate picture of his violent and chaotic upbringing.  (Doc. No. 1-2 at 24-28).

The MAR court found that counsel conducted a reasonable mitigation investigation. (Doc. No. 4 at 5).  Additionally, the court concluded that counsel's sentencing strategy of focusing on Morgan's good qualitites and acts of kindness and unselfishness was based upon reasonable tactical considerations.  (Id. at 4).  Accordingly, the court concluded that Morgan failed to show that counsel performed deficiently with respect to sentencing.  (Id. at 5, 9).

The MAR court relied, in part, upon a forensic psychiatric report that was not part of the record before it.  (Doc. No. 4 at 6-7, 13, 15-16, 19 (citing Ex. 4 of State's Answer)).  The report was prepared at Dorothea Dix Hospital by Dr. Robert Rollins (Doc. No. 17, Resp't's Ex. 1), and the State liberally cited it in its Answer to the MAR.  (Doc. No. 4-2 at 5, 10, 12, 15, 19). However, the State inadvertently failed to file the report as an exhibit to its Answer.  (Doc. No. 17: Resp't's Mot. for Summ. J. at 26 n. 1 (acknowledging State's failure to file Ex. 4 with its

Answer to the MAR)).  Morgan contends that because the MAR court relied upon an exhibit that was not part of the record before it, its denial of relief was based upon findings of fact that were not supported by the record.  Additionally, Morgan argues that the MAR court compounded its error by denying him an evidentiary hearing, rendering the entire fact-finding procedure inadequate to afford him a full and fair hearing in state court.  He contends, therefore, that he is entitled to an evidentiary hearing here.

Since the Petition was filed, the Supreme Court issued its opinion in Cullen v. Pinholster, which limits review under § 2254(d) to the record that was before the state court that adjudicated the claim on the merits.  131 S. Ct. at 1398.  Because Morgan's claim was adjudicated on the merits, an evidentiary hearing here is foreclosed.  See id.  As for the MAR court's reliance upon Dr. Rollins's report, the Court notes that the court never relied solely on the report in making its findings of fact.

Morgan had three sets of attorneys over the course of his trial.  On December 1, 1997, Buncombe County Assistant Public Defender Faye Burner was appointed to represent Morgan, and shortly thereafter, J. Calvin Hill, also an Assistant Public Defender, was appointed as second-chair to Ms. Burner.  On March 10, 1998, the trial court allowed both attorneys to withdraw because of a conflict of interest and appointed Stanley Young and Carol Andres to represent Morgan.  On April 6, 1999, the trial court relieved Ms. Andres as counsel for medical reasons and appointed Bruce Elmore to represent Morgan in her stead.

Only Mr. Elmore and Mr. Young's time records were before the MAR court, and there was no affidavit from Ms. Andres or Mr. Hill.  Nevertheless, the record shows that counsel's

23

mitigation investigation began shortly after Morgan's arrest.[5]  (Doc. No. 3-1, Habeas Pet. App.

A.10: Pet'r's MAR Ex. 28 ¶ 5).  During the course of their investigation, counsel learned that

Morgan had a history of head injuries and alcohol and drug abuse and that he had suffered

physical abuse at the hands of his father.  (Doc. No. 1-5: MAR Exs. 1 & 2; Doc. No. 3-1: MAR

Exs. 28 & 31; Doc. No. 3-2: MAR Exs. 35 & 36).  They also learned of Morgan's behavioral and

perceived mental problems that his family associated with his fall from the station wagon at age

nine.  (Doc. No. 1-5: MAR Exs. 1 & 2).  Consequently, counsel sought the assistance of a mental

health expert.  (Doc. No. 3-1: MAR Ex. 32; Doc. No. 3-2: MAR Ex. 35 at ¶ 15).[6]

On August 18, 1998, Ms. Andres wrote to neuropsychologist Claudia Coleman, PhD.,

inquiring whether she was available to interview Morgan while he was at Dorothea Dix

Hospital.[7]  (Doc. No. 3-1: MAR Ex. 32).  In an affidavit obtained by post-conviction counsel, Dr.

---

[5]Morgan's assertion that counsel did not begin their mitigation investigation until two
weeks before trial is contradicted by the record.  Ms. Burner began preparing for a capital
sentencing proceeding upon her appointment as counsel.  (Doc. No. 3-1, Habeas Pet. App. A.10:
Pet'r's MAR Ex. 28 ¶ 5).  In addition to interviewing Morgan, Ms. Burner interviewed members
of his family and began gathering medical, criminal, and prison records.  (Doc. No. 3: MAR Ex.
26; Doc. No. 3-1: MAR Ex. 28 ¶ 5).  Mr. Young's notes from a meeting with Ms. Bruner in
April, 1998, reflect that they discussed Morgan's history of head injuries and that one of
Morgan's brothers had evidence that he believed showed "how [Morgan's] state of mind
changes."  (Doc. No. 3-1: MAR Ex. 31).  Additionally, before Mr. Elmore approached Dr. Mark
Worthen as a possible mental health expert, Morgan's siblings confirmed that he had suffered a
severe head injury following his fall from an automobile.  (Doc. No. 3-2: MAR Ex. 35 ¶ 15).
Mr. Elmore first contacted Dr. Worthen on April 15, 1999.  (Doc. No. 3-5: MAR Ex. 44 at 6).

[6]The defense also moved for authorization of funds to retain a mitigation investigator, but
that request was denied by the trial court.  (Doc. No. 3-2: MAR Ex. 35 at ¶20).

[7]On August 17, 1998, the trial judge acted on an ex parte letter Morgan had written to
him in January, asking to be committed to Dorothea Dix Hospital in Raleigh, North Carolina.
(Doc. No. 3-1: MAR Ex. 30 at ¶ 5; Doc. No. 3-3, Habeas Pet. App. A.12: Pet'r's MAR Ex. 39).
Although Morgan withdrew the request, the judge ordered that he be committed to Dorothea Dix
for an evaluation to determine whether he was competent to stand trial.  (Pretrial Mot. Hr'g Tr.,
Aug. 17, 1998).  It was during this commitment that Dr. Rollins evaluated Morgan.  See

Coleman attested that she had no recollection of having received Ms. Andres' letter or of having any subsequent contact with her. (Doc. No. 3-3, Habeas Pet. App. A.12: Pet'r's MAR Ex. 40 at ¶ 3). Dr. Coleman attested further that her ordinary practice would have been to speak to Ms. Andres directly or to have left a message responding to her inquiry. (Id.). Ms. Andres's co-counsel, Mr. Young, stated in his post-conviction affidavit that Dr. Coleman was not available to evaluate Morgan. (Doc. No. 3-1: MAR Ex. 30 at ¶ 5).

On April 15, 1999, counsel moved for funds to hire Dr. Lonnie Sansbury, a psychologist who had served as an expert witness in a number of homicide trials. (Doc. No. 3-1: MAR Ex. 30 at ¶ 5; Doc. No. 3-2: MAR Ex. 35 at ¶14; Doc. No. 3-5: MAR Ex. 52 at ¶ 2). Although they sought an initial authorization of $5,000.00 to pay Dr. Sansbury, counsel were able to secure only $1,500.00 from the trial court. (Doc. No. 3-1: MAR Ex. 30 at ¶ 5; Doc. No. 3-2: MAR Ex. 35 at ¶14). Consequently, Dr. Sansbury declined to accept appointment to the case. (Doc. No. 3-5: MAR Ex. 52 at ¶¶ 2-4).

In May, 1999, counsel moved for funds to retain Dr. Mark Worthen, a clinical and forensic psychologist, who also had been an expert witness in capital cases. (Doc. No. 3-1: MAR Ex. 33; Doc. No. 3-2: MAR Ex. 35 at ¶17). In support of their motion, counsel attached a detailed affidavit from Dr. Worthen outlining the type of assistance they sought for Morgan's defense. (Doc. No. 3-1: MAR Ex. 33 at 25-31).

According to the affidavit, counsel asked Dr. Worthen to assess Morgan's mental status at the time of the offense and to evaluate his social and developmental history. (Id. at 26 ¶ 10 and 28 ¶¶ 12(b)(i), (c), (d)). Additionally, counsel requested that Dr. Worthen determine

_____

discussion supra pp. 22-23.

whether Morgan had suffered any psychological trauma during his life. (Id. at 28-29 ¶¶ 12(d)(1)-(2)). In particular, counsel wanted an analysis of how any such trauma would have affected Morgan's personality development, cognitive and emotional functioning, behavioral control, and the development of psychological and/or substance abuse problems. (Id. at 29 ¶12(d)(2)). Counsel also requested a current evaluation of Morgan's potential for future dangerousness within the correction system. (Id. at ¶ 12(d)(4)).

The court again approved substantially less than counsel requested for their mental health expert.[8] (Doc. No. 3-1: MAR Ex. 30 at ¶ 12; Doc. No. 3-2: MAR Ex. 35 at ¶18). Thereafter, Dr. Worthen conducted a limited assessment of Morgan. (Doc. No. 3-2: MAR Ex. 35 at ¶18). There is nothing in the record to indicate what that evaluation entailed, however.[9]

---

[8]There is a conflict in the record regarding the amount authorized by the trial court. According to Mr. Young's affidavit, the court authorized $2,500.00 in addition to the $1,500.00 previously authorized for Dr. Sansbury. (Doc. No. 3-1: MAR Ex. 30 at ¶ 12). According to Mr. Elmore, the additional amount was $6,000.00. (Doc. No. 3-2: MAR Ex. 35 at ¶18).

[9]Morgan contends that in addition to a lack of funds, Dr. Worthen's evaluation was limited by the amount of time remaining before trial and counsel's failure to provide him with the information necessary to conduct a thorough evaluation. (Doc. No. 1 at 16, 25). Morgan does not specify his basis for the latter accusation. There is no post-conviction affidavit from Dr. Worthen or copy of his report, if he prepared one, in the record. Consequently, the record contains almost no direct evidence of what Dr. Worthen's evaluation entailed, what conclusions he drew, or what he relied upon in reaching those conclusions. The only uncontroverted evidence regarding any of the above is that he had Morgan's prison records (Doc. No. 3-2: MAR Ex. 33 at 29 ¶ 12(d)(3)) but not his medical records (Doc. No. 3-2: MAR Ex. 35 at ¶¶ 15-16), and he did not have access to all of the crime-related discovery because the State had not yet turned all of it over to the defense (Doc. No. 3-1: MAR Ex. 30 at ¶ 4, 7; Doc. No. 3-2: MAR Ex. 35 at ¶¶ 7-8). The only support for Morgan's contention that Dr. Worthen's evaluation was limited also by time appears to be post-hoc rationalizations of trial counsel. (Doc. No. 3-1: MAR Ex. 30 at ¶ 12; Doc. No. 3-2: MAR Ex. 35 at ¶18). While the better course may have been for counsel to have secured funding for a mental health expert earlier than they did, the fact remains that the trial court did not authorize sufficient funds for Dr. Worthen to both conduct the comprehensive evaluation outlined in his affidavit and testify at trial. (Doc. No. 3-1: MAR Ex. 33 at 30 ¶ 17; see also Richter, 131 S. Ct. at 788 ("The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it

On June 6, 1999, counsel met with Dr. Worthen for six hours. (Doc. No. 3-2: MAR Ex. 34 at 5; Doc. No. 3-5: MAR Ex. 44 at 12). The next day, counsel informed the prosecutor and the trial court that they did not intend to present mental health testimony at either trial or sentencing. (Pretrial Mot. Hr'g Tr. at 77, June 7, 1999). The MAR court found that the results of Dr. Worthen's evaluation were not favorable to the defense and concluded that counsel made a strategic decision not to present mental health testimony as a result. (Doc. No. 4 at 7).

The court's finding was not unreasonable in light of the record before it. See § 2254(d)(2). From the beginning, defense counsel believed that Morgan's mental health could be a key mitigating factor at trial and/or sentencing (Doc. No. 3-2: MAR Ex. 33 at 1 ¶ 3) ("The mental health of the Defendant will be a crucial issue in this matter.")), and they went to considerable effort to secure funding for a mental health expert. Mr. Elmore's affidavit also makes clear that had counsel had a mental health diagnosis that they believed was of mitigating value, they would have used it at trial and/or sentencing. (Doc. No. 3-2: MAR Ex. 35 at ¶ 19). The fact that they did not use a mental health defense at either trial or sentencing supports the MAR court's finding that Dr. Worthen's evaluation was not favorable to the defense.[10]

---

deviated from best practices or most common custom.") (internal quote and citation omitted). This lack of funds would have been a limiting factor no matter when an expert was retained.

[10]The Court notes that Morgan never asserted in state court that he is mentally retarded or that he exhibits sub-average intellectual functioning. See Atkins v. Virginia, 536 U.S. 304, 321 (2002) (holding that the Eighth Amendment prohibits execution of the mentally retarded); see also N.C. Gen. Stat. § 15A-2005(a) (defining mental retardation for capital sentencing purposes as "[s]ignificantly subaverage general intellectual functioning, existing concurrently with significant limitations in adaptive functioning, both of which were manifested before the age of 18"). He did, however, argue in his MAR that Atkins should be extended to cover individuals suffering from substance abuse and traumatic brain injury-induced mental illness. (Doc. No. 1-3 at 21-23). The MAR court held that claim to be procedurally barred and without merit, finding no evidence of mental retardation as defined by North Carolina law. (Doc. No. 4 at 36-37); see also Walton v. Johnson, 440 F.3d 160, 176 (4th Cir. 2006) (deferring to state law definitions of

Even if the results of Dr. Worthen's evaluation were favorable, however, it is at least arguable that a reasonable attorney would forgo expert mental health testimony if he determined that his expert's opinion was not conclusive enough or strong enough to overcome potentially damaging cross-examination.  See e.g., Byram v. Ozmint, 339 F.3d 203, 210 (4th Cir. 2003) (concluding that counsel's strategic decision to forgo psychological evidence because of its suggestion of antisocial behavior was reasonable, as such evidence "is a double-edged sword that might as easily have condemned [defendant] to death as excused his actions") (quoting Truesdale v. Moore, 142 F.3d 749, 755 (4th Cir. 1998)).  In his pre-trial affidavit, Dr. Worthen observed that the prosecution could use the Presentence Diagnostic Committee Report from Morgan's 1976 Second-Degree Murder conviction to characterize his personality in unfavorable terms.  (Doc. No. 3-2: MAR Ex. 33 at 29 ¶ 12(d)(3)).  A reasonably competent attorney could have found the following particularly problematic for his client:

> [A]lcohol and drug abuse is a problem for this offender.  Our evaluations indicate that his use of these substances serves as an excuse for him to act without inhibitions, to refute his familial value system, and to avoid everyday stress. <u>When intoxicated, he appears to be likely to engage in behavior which endangers those around him and when sober he may still be somewhat violent and aggressive</u>. . . . Considering this individual's potential for violent and assaultive behavior, the Presentence Diagnostic Committee recommended an active sentence.

mental retardation.).  Citing Petitioner's own evidence that he had an I.Q. between 95 and 100, the MAR court separately observed that "[d]uring trial counsel['s] representation, Morgan showed no signs of sub-average intellectual functioning or other behavior exhibiting anything other than normal intelligence."  (Doc. No. 4 at 7, 35-36); cf North Carolina v. Nicholson, 558 S.E.2d 109, 144-45 (N.C. 2002) (describing an I.Q. between 66 and 72 as "borderline" and evidence of "mild retardation"), habeas corpus granted in part by Nicholson v. Branker, 739 F. Supp.2d. 839, 876 (E.D.N.C. 2010) (concluding that state court's rejection of Nicholson's mental retardation claim was unreasonable under § 2254(d)(1) & (d)(2)).  The MAR court also observed that neither the Supreme Court nor the North Carolina legislature had extended Atkins to those who could not demonstrate mental retardation as defined by § 15A-2005.  (Doc. No. 4 at 36-37).  Morgan has not raised an Atkins-related claim before this Court in his § 2254 petition.

. . .

Factors that are believed to have resulted in his criminal activity are rooted back to his early childhood.  It seems that there were many achievement oriented expectations placed on him by his family, in part because he was his father's namesake.  He seems to have felt that the strict discipline that he received was unfair and developed a feeling of resentment toward his family, especially his father, as the result of this .  However, he rigidly controlled himself against expressing this resentment directly.  Rather, it was evidenced in behavior that his parents would not approve.  He eventually rebelled to the point of behaving in an antisocial manner and adopted the role of the proverbial "black sheep."  Such behavior was exhibited primarily by his use of intoxicating substances, including alcohol . . . .  The use of these substances was pleasurable to him and allowed him the opportunity to absolve himself of any responsibility for any negative actions in which he engaged by letting him blame his behavior on the alcohol and drugs.

The primary reason for his actions in his present [Second-Degree Murder] case is an overreaction to a threat exacerbated by his intoxicated state.  In this case he continues to blame his behavior completely on drugs and alcohol and does not see that his actions probably resulted from underlying personal and emotional difficulties.  Included among these difficulties are his immaturity and his use of denial and projection to a pathological degree.  His use of drugs seems to be secondary to and symptomatic of these problems.

(Doc. No. 2-2: MAR Ex. 14 at 9, 10-11) (emphasis added).  The Committee recommended that

Morgan receive counseling while incarcerated "to confront him with the fact of the internal and

not external nature of his maladjustment."  (Id. at 12).  The Committee also opined, however,

that "[t]he prognosis for favorable change in [Morgan's] case was . . . poor because of [his] lack

of recognition of a problem."  (Id.).

Dr. Worthen indicated that an updated personality assessment was necessary to

determine if Morgan's personality had changed since 1976.  (Doc. No. 3-2: MAR Ex. 33 at 29 ¶

12(d)(3)).  Whether he performed an updated assessment is not in the record, but regardless, had

Dr. Worthen testified, the prosecution would have been entitled to copies of everything he relied

upon in making his diagnosis or reaching his conclusions, including Morgan's prison and

probation division records.[11]  (Doc. No. 2-1: MAR Ex. 7; Doc. No. 2-2: MAR Ex. 14 ).  Not only

did the Presentence Diagnostic Committee Report present a negative picture (Doc. No. 2-2:

MAR Ex. 14), a pre-sentence report prepared by the Division of Probation contained Morgan's

criminal history and details of the 1976 murder of Doc Brown (Doc. No. 2-1: MAR Ex. 7 at 5-7).

In that case, Brown and Morgan, who did not know each other, were drinking in the same bar.

(Id. at 5).  They engaged in conversation, and at some point, Doc Brown pulled a gun and

threatened to shoot Morgan.  (Id.).  Morgan's companions persuaded him to leave the bar, but

rather than avoiding any more trouble with Brown, Morgan got on his bike and rode the one mile

home, where he collected his brother's shotgun.  (Id.).  He then hitched a ride back to the bar,

and shot Brown, who was seated facing the bar, in the shoulder and head.  (Id. at 6).  Morgan

fled and hid in the woods for approximately six days before turning himself in to police.  (Id.).

While the defense could not avoid the existence of the previous murder, it is at least arguable

that a reasonable attorney could conclude that opening the door to cross-examination, or rebuttal

evidence, on the details would do more harm than good.[12]  See e.g. Wong v. Belemontes, __ U.S.

_____

[11]The prosecution had copies of Morgan's prison records prior to trial.  (Pretrial Mot.
Hr'g Tr. at 77, June 7, 1999).

[12]The trial court tightly restricted the type of evidence the State could introduce during its
sentencing case-in-chief regarding the details of Doc Brown's murder.  (Trial Tr. at 1705-1706).
It was a real possibility, however, that introduction of certain mitigating evidence would have
opened the door for the prosecution to introduce details of the Brown murder.  For example,
after Rev. Ray characterized Morgan as "kind" on direct examination (id. at 1767), the
prosecutor asked on cross whether his opinion would change if he knew that in 1976, Morgan
had "shot a man who was crippled in the back of the neck with a shotgun slug" (id. at 1775).
    The Court notes that the Division of Probation pre-sentencing report also details an
incident in which a teenaged Morgan was arrested for trespassing on school grounds after
assaulting the school principal.  Morgan's companion and willing accomplice was William Ray,
who later became Rev. Ray.  (Id. at 7).  A diligent prosecutor could have used this information
either to undermine Rev. Ray's credibility or to draw another unfavorable comparison between
Morgan and his peers.

___, 130 S. Ct. 383, 385-86 (2009) (<u>per curiam</u>) (observing that counsel limited the type of mitigating evidence he elicited at sentencing so that he did not open the door for the prosecutor to introduce the details of a murder the defendant previously had committed).

In short, there was ample evidence in the record to support the MAR court's finding that counsel's decision not to present expert mental health testimony was a strategic one and not mere oversight or neglect. The Court, therefore, "must indulge [the] strong presumption" that counsel "exercised . . . reasonable professional judgment" when they decided to forgo expert mental health testimony at sentencing. <u>See</u> <u>Strickland</u>, 466 U.S. at 689-90.

Morgan counters, however, that much of the deficiency in counsel's performance can be attributed to their failure to hire the right kind of expert. Morgan argues that instead of hiring a psychologist without expertise in neuroscience, counsel should have continued to pursue assistance from a neuropsychologist who could have determined whether he had brain damage and explained to the jury the impact child abuse and adolescent substance abuse has on the brain, particularly one that is damaged. In so arguing, Morgan overlooks some inconvenient circumstances that influenced counsel's decision-making.

The first is that although family and friends reported that Morgan's apparent mental problems began after his accident at age nine, counsel did not have medical records documenting a childhood head injury. (Doc. No. 3-2: MAR Ex. 35 at ¶ 19). Mr. Elmore states in his affidavit that he could not remember whether he and Dr. Worthen discussed the latter's qualifications to diagnose brain trauma from a closed head injury, but if they did not, it was because the defense had no medical evidence that Morgan had sustained a significant childhood head injury. (<u>Id.</u>). Although Memorial Mission Hospital turned over records of Morgan's 1990 treatment after a TV fell on him during the last year of his incarceration for second-degree murder (Doc. No. 3-1:

31

MAR Ex. 28 at ¶ 5; Doc. No. 3-2: MAR Ex. 35 at ¶ 15), the hospital never produced the 1964 records documenting his admission after he fell from the car as a child (Doc. No. 3-2: MAR Ex. 35 at ¶15). In fact, Mr. Elmore was informed by the hospital that given their age, those records were not available. (Id.).[13]

In her letter to Dr. Coleman, Ms. Andres specifically inquired whether she would be able to proceed with an evaluation without medical records. (Doc. No. 3-1: MAR Ex. 32). Dr. Coleman did not address that issue in her post-conviction affidavit, and Morgan has not provided any evidence that his post-conviction neuropsychologist, Dr. Herfkens, would have been willing to render an opinion that Morgan had suffered a traumatic brain injury that permanently affected his cognitive abilities without medical evidence documenting a significant head injury.

The records counsel had, on the other hand, pointed to a long history of substance abuse and unfavorable personality characteristics. (Doc. No. 3-2: MAR Ex. 33 at 26 ¶ 10, 28 ¶ 12(b)(i), 29 ¶ 12(d)(3)). As a forensic and clinical psychologist, Dr. Worthen was qualified to perform a personality assessment to determine whether Morgan's personality characteristics had improved. (Id. at 29 ¶ 12(d)(3)).

Notwithstanding the absence of medical evidence, the record reflects that the defense had not abandoned investigation of possible brain damage when they sought authorization of funds to hire Dr. Worthen. (Id. at 28 ¶¶ 12(b)(i)-(ii))). In his affidavit, Dr. Worthen stated that in light of Morgan's reported childhood head injury, a neuropsychological evaluation might be required to help determine his mental status at the time of the murder, and that, at a minimum, a

_____

[13]The fact that post-conviction counsel were able to obtain these records in 2005-2006 is irrelevant. Counsel's actions are assessed in light of the totality of the circumstances <u>at the time the performance was rendered</u>. <u>Strickland</u>, 466 U.S. at 690 (emphasis added).

neuropsychological screening was necessary.  (Id.).  Dr. Worthen noted for the trial court's

benefit that he was not a neuropsychologist.  (Doc. No. 3-1: MAR Ex. 33 at 28 ¶ 12(b)(ii)).

The purpose of Dr. Worthen's affidavit was to educate the trial court about the forensic

evaluation process, the resources used, and the number of hours it would take to complete a

comprehensive evaluation and report, prepare for trial, and testify at sentencing.  (Id. at 26-31).

After their experience attempting to obtain funding for Dr. Sansbury, it appears counsel hoped

that educating the court about the evaluation process would help secure sufficient funding for Dr.

Worthen.  (Doc. No. 3-2: MAR Ex. 35 at ¶17).  Dr. Worthen estimated that his involvement in

the case, including preparing for and testifying at trial and/or sentencing, would require

approximately 79 hours and compensation in the amount of $11,200.00.  (Doc. No. 3-1: MAR

Ex. 33 at 30-31).  Notably, Dr. Worthen's estimates did not include the time and funds needed

for either a neuropsychological screening or neuropsychological evaluation.  (Id.).

As previously discussed, the court authorized substantially less than counsel requested

for Dr. Worthen's services.  The defense, therefore, did not have the funds for both a

comprehensive forensic evaluation and thoroughly prepared expert testimony, much less

additional neuropsychological screening or evaluation.  "Counsel was entitled to formulate a

strategy that was reasonable at the time and to balance limited resources in accord with effective

trial tactics and strategies."  Richter, 131 S. Ct. at 789 (citations omitted).  They opted to have

Dr. Worthen conduct a limited assessment.[14]

_____

[14]Morgan notes that about two weeks before trial, Mr. Elmore consulted by phone with
Dr. Coleman, the neuropsychologist the defense originally had approached.  Without addressing
the defense's budget limitations, Morgan unfairly lambasts counsel for not taking the
opportunity "to ask [Dr. Coleman] about conducting a neuropsychiatric evaluation to determine
if [he] was brain damaged" and laments that "[a]t that point [Dr.] Coleman was unable to
evaluate Morgan before trial."  [Doc. No. 1 at 4].  Counsel, however, already had decided to

33

Morgan's counsel confronted a challenging penalty phase with a client who already had one murder conviction and who had beaten another man twice in a dispute over a dollar (Trial Tr. 1441-54). Counsel's difficulty was compounded by the brutal nature of the crime and Morgan's sketchy memory. Although he claimed to have been acting in self-defense, he could remember almost nothing about the fight with Ms. King, except that she was still alive when it was over. (Trial Tr. 1564). The State's evidence, on the other hand, showed that Ms. King ended up under a car, half-naked and bleeding to death from 48 slash or stab wounds, some made with enough force to fracture her skull in two places, sever three arteries, and break her cheekbone, a vertebrae in her lower back, and a rib, which then punctured her lung. (Trial Tr. 1364-1379). Counsel clearly recognized that if they reached the penalty phase it would be because the jury had rejected acute intoxication and self-defense as defenses to premeditated and deliberate first-degree murder.[15] The defense, however, had no expert mental health evidence to help the jury understand what, other than acute intoxication, caused Morgan to react the way he did to a perceived threat from Ms. King. Given these circumstances, it is at least arguable that counsel adopted a reasonable penalty-phase strategy of humanizing Morgan by showing that he

forgo expert mental health testimony, and Mr. Elmore's purpose in calling Dr. Coleman was to discuss a different diminished capacity factor – acute intoxication. (Doc. No. 3-3: MAR Ex. 41). The two discussed whether, at the time of the murder, Morgan could have been experiencing "cocaine rage," a mental state that can result from combining cocaine and alcohol. (Id.). Dr. Coleman referred Mr. Elmore to a psychiatrist who worked at Duke University and who was an expert in the field of alcohol and substance abuse. (Id.; Doc. No. 3-3: MAR Ex. 40 at ¶ 4). The record does not indicate whether counsel contacted the psychiatrist. However, Mr. Elmore used his cross-examination of Dr. Jason, the forensic pathologist, to elicit testimony regarding the effect cocaine can have on the body, including causing paranoia, excitement, rapid heartbeat, and altered perception of reality. (Trial Tr. at 1387-88).

[15]The jury deliberated for less than 45 minutes before convicting Morgan of the premeditated and deliberate First Degree Murder of Ms. King. (Trial Tr. 1680-61).

34

was not the one-dimensional, "evil" man the State would attempt to portray but was a kind and generous person whose life had value and whose family would suffer if he was executed.

Attempting to evoke sympathy for a defendant's family was a recognized sentencing tactic in North Carolina at the time of Morgan's trial.[16]  He argues, however, that counsel could have presented evidence of childhood abuse, the childhood head injury and subsequent bizarre behavior, and long-term substance abuse through lay witnesses without contradicting that strategy.  Morgan asserts that because counsel failed to conduct an adequate mitigation investigation, they were unable to present this evidence to the jury.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  Counsel's decision not to investigate a particular issue or pursue a particular line of evidence must be "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Id.

Counsel knew that in addition to Morgan's head injury, bizarre behavior, long history of

---

[16] See e.g., Allen v. Lee, 366 F.3d 319, 331 (4th Cir. 2004) (Wilkins, C.J., concurring) (noting that North Carolina's "catch-all" mitigating circumstance, N.C. Gen. Stat. § 15A-2000(f)(9), permits jurors to consider whether evidence supports imposition of a life sentence on the grounds of mercy and opining that a reasonable juror could have concluded that Allen should be spared from the death penalty so that his children would not lose their father) (citation omitted); Hunt v. Lee, 291 F.3d 284, 294-95 (4th Cir. 2002) (concluding that state court did not unreasonably apply Strickland when it found counsel rendered effective assistance by forgoing introduction of mitigating evidence and arguing for mercy at sentencing); State v. Augustine, 616 S.E.2d 515, 532 (N.C. 2005) (finding that counsel's argument was designed to elicit sympathy for the defendant's parents); State v. Conner,480 S.E.2d 626, 632 (N.C. 1997) (holding that while the court may not instruct that sympathy is a mitigating circumstance, the "catchall" mitigating circumstance phrase in § 15A 2000(f)(9) permits consideration of sympathy); State v. Alston, 461 S.E.2d 687, 715-16 (N.C. 1995) (finding no error where prosecutor urged jurors to recommend a death sentence despite any feelings of sympathy they might have for the defendant's parents).

alcohol and substance abuse, and juvenile delinquency, there was physical abuse in the Morgan household when Morgan was growing up and that his siblings had criminal records and problems with alcohol.  (Doc. No. 2-1: MAR Ex. 7; Doc. No. 2-2: MAR Ex. 14; Doc. No. 3-1: MAR Ex. 33 at 26 ¶ 10; Doc. No. 3-2: MAR Ex. 35 ¶¶ 13,15; 36, MAR Ex. 36; Doc. No. 3-5: MAR Ex. 45).  As previously outlined, several witnesses testified at sentencing about Morgan's long history of alcohol and substance abuse, portraying it as something with which he had struggled and which caused concern among family and friends.  (Trial Tr. at 1772-73, 1792, 1829-31).  In that context, Robert Morgan acknowledged his own struggles with alcohol.  (Id. at 1792).  It is at least arguable that a reasonable attorney could conclude that a jury would not be receptive to evidence implying that the circumstances of Morgan's childhood and family life should mitigate Ms. King's murder, particularly in light of his siblings' relative success in life.  While it is true that both Robert and Rick had criminal records and problems with alcohol, it is at least arguable that a reasonable attorney could conclude that without a mental health expert to explain its significance, the jury might not view such evidence as mitigating.  After all, Robert beat his addiction and had a successful career in the military, and Rick owned his own business.  Moreover, neither had killed anyone, much less two people, despite having grown up in the same home as Morgan.[17]

---

[17]The Court notes that no juror found that the onset of Morgan's alcohol addiction at age 14, his impoverished background, his difficulty fitting in at school, or the ridicule he suffered due to his bed-wetting problem mitigated Ms. King's murder.  (Doc. No. 3-5: MAR Ex. 48 at ¶¶ 6, 7, 11).  On the other hand, jurors were receptive to evidence demonstrating Morgan's acceptance of responsibility for himself and others.  Specifically, one or more jurors considered it mitigating that Morgan regularly paid child support for his daughter, that he freely admitted his involvement in the murder of Ms. King to police, that he prevented his nephew from assaulting another individual, that he regularly assisted his neighbors with minor repairs to their homes and yards, sometimes without payment, and that since his incarceration for the King murder, he attended weekly church services at the Buncombe County Detention Facility.  (Id. at

36

It also is arguable that a reasonable attorney could conclude that jurors would find a good deal of the suggested evidence aggravating rather than mitigating. Morgan's childhood gang involvement, propensity for violence, substance abuse, and criminal history, for example, are not clearly mitigating and could have led jurors to conclude that Morgan simply was incorrigible. Cf. Atkins v. Virginia, 536 U.S. 304, 321 (2002) (recognizing that some mitigating evidence can be a "two-edged sword" that juries might conclude shows future dangerousness) (citation omitted).

Contrary to Morgan's assertion, counsel reasonably could have concluded that introducing evidence of childhood abuse in the Morgan household, his childhood head injury and subsequent bizarre behavior, and additional details of his long-term substance abuse would be inconsistent with, dilute, or undermine their strategy of showing positive aspects of Morgan's character and demonstrating the impact his execution would have on his family. It, therefore, would have been reasonable for counsel to decide that further investigation of those areas was unnecessary. See Strickland, 466 U.S. at 691.

Morgan also contends that counsel should have presented evidence of his positive adjustment to incarceration and his low risk of future dangerousness within the correction system.[18] The record does not indicate whether Dr. Worthen assessed Morgan for future

---

¶¶ 5, 15, 17-18, 23).

[18]Morgan asserts that Dr. Worthen "notified [counsel] of their need to present this kind of evidence" and warned "that if the prosecution used [Morgan's DOC records] to argue that he is a future danger, then . . . counsel would need to rebut it" but that counsel failed to follow up on this recommendation. (Doc. No. 1 at 37). In actuality, Dr. Worthen noted, for the trial court's benefit, that if the prosecutor were to introduce evidence at sentencing of Morgan's potential for future dangerousness, the defense would need to be prepared to rebut it. (Doc. No. 3-1: MAR Ex. 33 at 29 ¶ 12(d)(4)). The prosecution did not introduce Morgan's prison records or any evidence, other than the two aggravating circumstances, demonstrating his potential for future

dangerousness within the correction system, although that was part of his original evaluation plan. (Doc. No. 3-1: MAR Ex. 33 at 29 ¶ 12(d)(4)).

Morgan's positive adjustment to prison was implied through testimony that he was on work-release and received weekend passes to spend with his family during his incarceration for second-degree murder. (Trial Tr. at 1723-26). Anything more, however, would have required testimony from an expert or a present or former DOC official who could have testified about his record. Post-conviction counsel presented an affidavit from one of Morgan's DOC case managers, Deborah Hipps, who would have testified that Morgan was not a trouble-maker, was trustworthy, reported an inmate escape to Correction officers, and took advantage of alcohol and drug abuse treatment programs during his second-degree murder incarceration. (Doc. No. 3: MAR Ex. 23, ¶¶ 3-6).

Such testimony would have allowed the prosecutor to use Morgan's prison records to cross-examine Ms. Hipps or any other DOC official, and those records were not clearly mitigating. While the incarceration records themselves describe Morgan's adjustment as positive, showing steadily decreasing levels of security, approval for work release, community visits with a volunteer, weekend passes home, and eventual parole (Doc. No. 2-5: MAR Exs. 16 & 17; Doc. No. 3: MAR Exs. 18-21), the Presentence Diagnostic Committee Report, as previously indicated, describes Morgan in far more negative terms (Doc. No. 2-2: MAR Ex. 14).

---

dangerousness but did <u>argue</u> in closing that a life sentence would endanger everyone that Morgan came into contact with during his incarceration. (Trial Tr. at 1890). Argument is not evidence, and there would have been nothing to prevent the prosecutor from making the same argument had the defense presented volumes of evidence demonstrating a lack of future dangerousness. <u>See</u> discussion *infra* p. 39-40. Trial counsel responded to the prosecutor's argument by arguing in closing that "Mr. Morgan is no longer going to be a threat to anybody in prison for the rest of his life." (Trial Tr. 1904).

Additionally, although he had only six infractions, at least two were for fighting and disobeying orders.[19] (Doc. No. 3: MAR Ex. 21).

More importantly, putting Morgan's future dangerousness and/or positive adjustment to incarceration at issue could have opened the door for the prosecutor to use cross-examination, or possibly rebuttal evidence, to get details of the first murder before the jury and, at a minimum, to elicit evidence that Morgan was on parole for his Georgia robbery conviction when he killed Doc Brown and that he was on parole for that murder conviction when he murdered Ms. King. See e.g., Belmontes, 130 S. Ct. at 389 (observing that evidence of positive adjustment to incarceration would have opened the door to questions regarding the defendant's propensity for violence before he committed two murders). It is at least arguable that a reasonable attorney could conclude that pushing evidence of lack of future dangerousness and positive adjustment to incarceration might do nothing more than highlight for jurors that his positive adjustment to incarceration for second-degree murder did not inhibit Morgan from committing another murder.

Finally, Morgan makes much of the idea that had trial counsel presented some or all of the post-conviction evidence, they would have foreclosed certain of the prosecutors' closing arguments. (Doc. No. 1 at 20, 29, 31). The Court is not convinced. In confronting a similar argument in Pinholster, Justice Thomas, writing for the majority, observed that "[a]ny diligent prosecutor would have challenged whatever mitigating evidence the defense had put on" and that

_____

[19]There appears to be a conflict in the record regarding the number of "major" infractions Morgan had. Two 1989 DOC reclassification reports by Ms. Hipps indicate that Morgan incurred four major infractions during his sentence. (Doc. No. 3: MAR Exs. 20, 21). On the other hand, a 1990 DOC reclassification report, also by Ms. Hipps, indicates that Morgan had two major infractions. (Doc. No. 3: MAR Ex. 19). A diligent prosecutor could have used this apparent contradiction on cross-examination to undermine the reliability of the records and the credibility of the witnesses testifying about them.

the prosecutor could not have been expected to describe the evidence in the light most favorable to the defendant in his closing argument. 131 S. Ct. at 1409 n.19. The same is true here. Thus, presenting evidence that Morgan had brain damage would not have prevented the prosecutor from arguing that Morgan could appreciate the criminality of his conduct (Trial Tr. at 1872) and that "he did not have mental or emotional conditions" (id. at 1871).[20] Likewise, presenting evidence of Morgan's abusive childhood and siblings' criminal records and alcohol problems would have required the prosecutor, at most, to modify his argument that Morgan's siblings, who grew up in the same household with the same rules, were successful people who had not killed or robbed anyone.[21] (Id. at 31).

In sum, Morgan has failed to demonstrate that there was no reasonable basis for the MAR court's conclusion that counsel performed adequately with respect to the penalty phase of trial. See Richter, 131 S. Ct. at 784. Because the MAR court's decision on the performance prong was not "so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," id. at 786-87, the Court need not address the court's conclusion that Morgan also failed to prove prejudice under Strickland. See Gardner v. Ozmint, 511 F.3d 420, 429 n.3 (4th Cir. 2007) (citing United States v. Roane, 378 F.3d 382, 409 n.15 (4th Cir. 2004); Williams v. Kelly, 816 F.2d 939, 946-47 (4th Cir. 1987)).

---

[20]The Court notes that notwithstanding the prosecutor's argument, the jury found that Morgan was under the influence of a mental or emotional disturbance, § 15A-2000(f)(2) supra p. 11, and that his ability to appreciate the criminality of his conduct was impaired, § 15A-2000(f)(6) supra p.11, at the time of the murder. (Doc. No. 3-5: MAR Ex. 48 at 57-58).

[21]Rick Morgan did, however, have a shoplifting conviction. (Doc. No. 3-5: MAR Ex. 46 at 42).

Case 1:09-cv-00416-RJC   Document 33   Filed 07/17/12   Page 40 of 41

**IV.    CONCLUSION**

The MAR's court's conclusion that counsel performed adequately with respect to their mitigation investigation and sentencing strategy did not involve an unreasonable application of Supreme Court precedent.  See § 2254(d)(1).  Morgan, therefore, is not entitled to relief, and Respondent is entitled to summary judgment as a matter of law.

Furthermore, pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, the petitioner must establish both that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right).  Morgan has failed to make the required showing.

**IT IS, THEREFORE, ORDERED** that:

1.    The Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 (Doc. No. 1) is **DENIED** and **DISMISSED**, and

2.    Respondent's Motion for Summary Judgment (Doc. No. 16) is **GRANTED**.

Signed: July 17, 2012

Robert J. Conrad, Jr.
Chief United States District Judge

41