**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL CASE NO. 1:09cv416**

| | | |
|---|---|---|
| **JAMES LEWIS MORGAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **CARLTON JOYNER, Warden,[1]** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**THIS MATTER** is before the Court upon Petitioner James Lewis Morgan's Amended

Petition for Writ of Habeas Corpus, 28 U.S.C. § 2254. (Doc. No. 56) Also before the Court is

Respondent's Motion for Summary Judgment. (Doc. No. 58)

## I.      PROCEDURAL HISTORY

Morgan was convicted of the first-degree murder of Patrina King in Buncombe County,

North Carolina and sentenced to death. The State's evidence was summarized by the North

Carolina Supreme Court as follows,

> [D]efendant and his nephew, Kenneth Cato (Cato), were living at 13 Ridge Street
> in Asheville. On the evening of 25 November 1997, Cato arrived home around
> midnight to find defendant and King sitting in the living room. They appeared to
> him to have been smoking crack cocaine, and Cato heard defendant tell King that
> he wanted a "head job." When King refused and tried to depart, defendant started
> shouting and smacked her. Defendant also grabbed a beer bottle by the neck,

---

[1] The Petition originally named Gerald Branker, then-Warden of Central Prison, as Respondent. (See Docket No. 1.)
In August, 2013, Carlton Joyner was appointed Warden of Central Prison. Consistent with Rule 2(a) of the Rules
Governing Section 2254 Cases in the United States District Courts, 28 U.S.C.A. foll. § 2254, and by operation of
Federal Rule of Civil Procedure 25(d) (applicable to this proceeding pursuant to Rule 12 of the Rules Governing
Section 2254 Cases), Carlton Joyner now appears as Respondent.

threatened Cato with it, and ordered him to leave.  Although Cato stepped out of the room, defendant continued hitting King.  Cato told defendant to stop, then reentered the room and began to wrestle with defendant.  During their struggle, defendant hit Cato on the head with the beer bottle, then chased Cato outside and around a vehicle parked on Ridge Street.  According to Cato, defendant was holding a knife during the chase.  Meanwhile, King emerged from the house and started down the street.  When defendant began to follow her, Cato ran for help to the home of defendant's brother, Richard Morgan (Rick), about a half mile away.

The two drove back to Ridge Street, where Cato saw a broken bottle in the street and King lying between two cars.  Rick knocked on the door of Stacey Miller's home at 12 Ridge Street and asked him to call 911.  Unable to comply because he did not have a telephone, Miller stepped outside to see what was happening.  Defendant returned to the scene, carrying a knife.  Miller saw defendant, Rick, and Cato standing together, engaged in conversation.  Defendant said, "You-all are the reason why this happened to me," and chased Cato around the car shouting either "I'll kill you, too" or "I should have killed you."  Someone called 911, and defendant walked away when police arrived at the scene.

Shortly before 2:00 a.m. on 26 November 1997, Sergeant Mike Hahn of the Asheville Police Department, driving a Chevrolet Blazer, responded to a call requesting police assistance on Ridge Street.  As Sergeant Hahn approached the scene, he observed a black male in dark clothing walking in the opposite direction.  Sergeant Hahn then came upon a Chevrolet Monte Carlo parked on the wrong side of the road.  He exited his vehicle and found King lying on her stomach with her shoulders and head under the rear of the Monte Carlo.  Her jeans and underwear were pulled down and a sheet or curtain partially covered her body.  The entire area behind the car was covered with blood and broken glass, although no knife was found at the scene.  As Sergeant Hahn began to assess King's condition, he noticed Cato and Rick and heard Cato say, "You just drove right by him."  EMS personnel arrived at the scene and King was transported to a nearby hospital, where doctors performed emergency surgery in an unsuccessful attempt to save her life.

Forest Weaver, a detective in the Criminal Investigations Division of the Asheville Police Department, went to Ridge Street around 9:00 a.m. on 26 November 1997.  He found defendant hiding in the basement of 20 Ridge Street.  Once defendant emerged, he was handcuffed and transported to the Asheville Police Department.

Willie Albert Jones, an inmate at the Buncombe County Jail, shared dormitory space in the jail with defendant.  Jones testified that defendant told everyone in earshot about the murder, saying the victim used his drugs but would not give him sex.  Defendant also wrote and sang a rap song about the murder.  Jones recalled that the words of the song were "You shouldn't have done what you done . . . smoke my rock, wouldn't give me none, you know, and I went and did what I did . . . I told you once, I told you twice, that you are going to have to pay the sacrifice . . . with

2

your life." Another inmate, Eddie Oglesby, similarly testified that defendant sang about the killing and told Oglesby that he slashed the victim. According to Oglesby, defendant told him that the victim would not give him oral sex after smoking defendant's cocaine and that, in frustration, defendant hit the victim on the back of the head with a bottle and stabbed her.

Donald Jason, M.D., the forensic pathologist who performed the autopsy on King, testified that she suffered a total of forty-eight wounds to the face, head, back, buttocks, and upper back of her legs. Dr. Jason was of the opinion that King bled to death because of multiple stab and incised wounds caused by ['‘]a sharp object. These wounds are not consistent with typical knife wounds. They are all different sizes, shapes, irregular, fairly shallow. But some other type of sharp object such as something made out of glass that has a broken, sharp edge, or broken sharp edges of varying sizes and shapes.[’]

State v. Morgan, 604 S.E.2d 886, 891-92 (N.C. 2004), cert. denied, 546 U.S. 830 (2005).[2]

Morgan testified on his own behalf and claimed that he acted in self-defense. According

to Morgan,

he and King drank beer and smoked cocaine the evening of 25 November 1997. When Cato arrived later that evening, he gave defendant some crumbs of crack cocaine. King, who wanted more, began "screaming and hollering" when defendant declined to share the crumbs. Cato offered to let King use his [crack] pipe, and then both she and Cato asked defendant to buy more cocaine. Defendant refused because he wanted to save the rest of his money for his daughter. Defendant pulled his money out of his pocket and Cato snatched it away from him. When defendant attempted to retrieve it, King hit defendant over the shoulder with a beer bottle. As defendant turned to grab the bottle away from King, Cato approached defendant from behind and put him in a choke hold. Defendant hit Cato with the beer bottle in an unsuccessful attempt to free himself. Cato pulled a .25 automatic pistol from his pocket, placed it against defendant's head, and pulled the trigger. When the gun failed to fire, defendant reached for a knife that was on the table in front of him and Cato ran out the door. Defendant followed Cato and chased him around a car but could not catch him. Defendant stopped to catch his breath, and King hit him from behind with a beer bottle. The two began to fight in the middle of the street. According to defendant, ['‘][King] would swing the bottle, I would swing the knife. It was rough.[’]

---

[2] Kenneth Cato died of a self-inflicted gunshot wound in 1998. (Aff. of Bruce Elmore ¶ 6, MAR Ex. 35, Doc. No. 3-2) His out-of-court statements to investigators were admitted during the State's case-in-chief under exceptions to the rule against hearsay. (Pretrial Hr'g Tr. 76, June 8, 1999, Doc. No. 62)

Id. at 892-93.  Morgan described himself as being surprised by his companions' actions and denied any memory of what happened between himself and Ms. King after they began fighting in the street.  (Trial Tr. 1560, 1565, Doc. No. 62-12)  He denied any memory of stabbing Ms. King.  (Trial Tr., supra, at 1565-66)

Morgan testified that he could not understand how things had gotten so complicated so quickly and that he was just reacting and overreacting to the others' aggressive acts.  (Trial Tr., supra, at 1563, 1565-66)  He recalled asking Cato, after he had returned to the scene with Rick, "Why, why did you – all do that?"  (Trial Tr., supra, at 1563)  He also acknowledged that he was addicted to crack cocaine and alcohol.  (Trial Tr., supra, at 1553)  Morgan testified that the incident had nothing to do with sex and denied that he ever sang a song about the murder while in custody.  Morgan, 604 S.E.2d at 893.

Counsel argued in closing that Patrina King's death was the tragic outcome of a fight over money and cocaine between three people who were high on crack and that Morgan's acute intoxication caused him to overreact and use excessive force when defending himself from a physical attack by King.  (Trial Tr., supra, 1626-1642)  The trial court instructed the jury on first-degree murder, second degree-murder, voluntary manslaughter, and self-defense.  (Trial Tr. 1665-75, Doc. No. 62-13)  The jury returned a verdict of first-degree murder on the basis of premeditation and deliberation.

Morgan's conviction and sentence were affirmed on direct appeal.  Morgan, 604 S.E.2d at 891.  Morgan filed a Motion for Appropriate Relief ("MAR") in the Buncombe County Superior Court on July 17, 2006.  (Doc. Nos. 1-1 thru 1-3)  Upon the State's Motion for Summary Denial on the Pleadings (Doc. No. 6-3), the court denied Morgan's MAR on December 29, 2008, without holding an evidentiary hearing.  (Doc. No. 4)  Morgan filed a

Petition for Writ of Certiorari in the North Carolina Supreme Court, seeking review of the denial of his MAR. The certiorari petition was denied on August 27, 2009. State v. Morgan, 683 S.E.2d 380 (N.C. 2009).

On November 13, 2009, Morgan's state post-conviction counsel filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court on Morgan's behalf. (Doc. No. 1) The Court appointed post-conviction counsel to represent Morgan in his federal habeas proceedings. (Doc. No. 10) In his Petition, Morgan claimed that trial counsel were ineffective for failing to investigate and present an adequate mitigation defense at sentencing.

The Court denied and dismissed Morgan's habeas Petition and granted Respondent's Motion for Summary Judgment on July 17, 2012. (Doc. No. 33) The Court also denied Morgan's Motion to Alter or Amend Judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. (Doc. No. 38) Morgan timely appealed. (Doc. No. 39)

On appeal in the Fourth Circuit, Morgan moved for appointment of qualified, independent counsel and remand pursuant to Martinez v. Ryan, 132 S. Ct. 1309 (2012). The court granted Morgan's motion (Doc. No. 47), and appointed M. Gordon Widenhouse, Jr. and George Glenn Gerding (hereinafter "Martinez counsel") to investigate and file any additional claims in the district court in accordance with Martinez (Doc. No. 48).

On July 10, 2015, Martinez counsel filed a motion in this Court seeking funds to hire an expert on prisons and adjustment to incarceration. (Mot. ¶ 6, Doc. No. 54) Counsel argued that appointment of such an expert was reasonably necessary to investigate the lengthy prison sentence Morgan served for second-degree murder in an unrelated homicide. (Mot., supra, at ¶ 4) Counsel asserted that positive adjustment to this earlier incarceration would have provided a basis on which mitigating evidence might have been developed by trial counsel. (Mot., supra)

In denying the Motion, the Court concluded that appointment of an expert was not reasonably necessary because Morgan had exhausted a claim in the state courts that trial counsel were ineffective for failing to investigate, obtain, and present lay and expert testimony about Morgan's ability to adjust to life imprisonment without parole and low risk of future dangerousness in prison. (Order, Doc. No. 55) The Court noted further that the state post-conviction court rejected Morgan's adjustment to incarceration and future dangerousness-related ineffective assistance claims on the merits, as did this Court when Morgan raised the same claims in his federal Petition for Writ of Habeas Corpus. (Order, supra)

On September 10, 2015, Martinez counsel filed an Amended Petition for Writ of Habeas Corpus, claiming trial counsel rendered ineffective assistance by failing to: (1) investigate, prepare, and present a diminished mental capacity defense at trial (Claim II); (2) request a jury instruction on diminished mental capacity based upon the evidence presented at trial (Claim III); and (3) obtain and present expert testimony at sentencing regarding Morgan's potential to adapt to life in prison and lack of future dangerousness (Claim IV). (Doc. No. 56) Respondent filed an Answer, a Motion for Summary Judgment, and a Memorandum in Support (Doc Nos. 57-59), and Morgan filed a Response to the Summary Judgment Motion (Doc. No. 60).

## II.     STANDARD OF REVIEW

### A.     Summary Judgment

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 587–88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

**B.      Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")**

Ordinarily, a petitioner is procedurally barred from obtaining federal habeas review of a claim that he failed to raise and exhaust in state court, see Coleman v. Thompson, 501 U.S. 722, 750 (1991), if the state court "to which the petitioner would be required to present his claim[ ] in order to meet the exhaustion requirement would now find the claim[ ] procedurally barred," Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). Under this procedural default doctrine, habeas review of the claim will be permitted only if the petitioner can demonstrate (1) cause for the default and prejudice resulting therefrom or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750.

In some circumstances, a petitioner may establish cause if he was represented by counsel whose performance was constitutionally ineffective under the standards established in Strickland v. Washington, 466 U.S. 668 (1984). See Coleman, 501 U.S. at 752; Murray v. Carrier, 477 U.S. 478, 488 (1986). In Coleman, however, the Supreme Court held that because "[t]here is no constitutional right to an attorney in state postconviction proceedings," a federal habeas "petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings" to establish cause. Coleman, 501 U.S. at 752.

In Martinez v. Ryan, the Supreme Court announced a "narrow exception" to the Coleman rule. 132 S. Ct. at 1315. Specifically, the Court held that:

> Where, under state law, claims of ineffective assistance of trial counsel must be
> raised in an initial-review collateral proceeding, a procedural default will not bar a
> federal habeas court from hearing a substantial claim of ineffective assistance at

trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was [constitutionally] ineffective.

Id. at 1320.  Shortly thereafter, the Supreme Court held that the Martinez exception also applies to ineffective assistance of trial counsel claims that state law might, on its face, permit to be brought on direct appeal, if the "structure and design" of the state system "in actual operation . . . make it 'virtually impossible'" to do so.  Trevino v. Thaler, 133 S. Ct. 1911, 1915 (2013).

## C.    Applicability of Martinez to North Carolina Cases

In Fowler v. Joyner, the Fourth Circuit recognized that North Carolina does not fall neatly within Martinez or Trevino.  753 F.3d 446, 461 (4th Cir. 2014) cert. denied, 135 S. Ct. 1530 (2015).  Under North Carolina law, ineffective assistance of trial counsel claims that are apparent from the cold record must be brought by the prisoner on direct appeal.  See N.C. Gen. Stat. § 15A–1419(a)(3) (requiring denial of a motion for appropriate relief if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the . . . motion but did not do so"); State v. Fair, 557 S.E.2d 500, 524 (N.C. 2001) (Ineffective assistance of trial counsel claims "brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing.").  As to those claims, "the state collateral review proceeding [is not] the initial review proceeding in respect to the . . . claim," and the Martinez exception to Coleman will not apply. Fowler, 753 F.3d. at 463 (citation and internal quotation marks omitted).

Ineffective assistance of trial counsel claims that are not apparent from the trial record, however, "should be considered through motions for appropriate relief and not on direct appeal." Id. (quoting State v. Stroud, 557 S.E.2d 544, 547 (N.C. Ct. App. 2001)) (internal quotation marks

omitted); see also State v. Long, 557 S.E.2d 89, 93 (N.C. 2001) ("Thus, while in some situations a defendant may be required to raise an [ineffective assistance of trial counsel] claim on direct appeal, a defendant will not be required to do so in all situations."). These claims "will fall within the Martinez exception." Fowler, 753 F.3d at 463.

The Fourth Circuit summarized the rule announced in Martinez thusly:

> a federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consist[s] of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding."

Fowler, 753 F.3d at 461 (quoting Trevino, 133 S. Ct. at 1918 (internal quotation marks, alterations, and emphasis omitted)). In North Carolina, federal habeas courts also must "determine, on a case-by-case basis, whether the particular ineffective-assistance-of-trial-counsel claim identified, regardless of its merit, is nonetheless procedurally defaulted because it could have been and should have been raised on direct appeal." Fowler, 753 F.3d at 463.

## III.    DISCUSSION

### A.    Ineffective Assistance of Counsel

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). To succeed on an ineffective assistance of counsel claim, a convicted defendant must establish that his counsel's performance was deficient; that is "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and

that counsel's deficient conduct prejudiced the outcome; that is "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

As to the performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness[ ]" "under prevailing professional norms[ ]" and "considering all the circumstances." Id. at 688. To eliminate the "distorting effects of hindsight," "[a] fair assessment of attorney performance requires that every effort be made to . . . reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. "Judicial scrutiny of counsel's performance must be highly deferential[,]" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689-90 (quoting Michel v. Louisiana, 350 U.S. 91, 101(1955)).

In addition to showing that trial counsel's performance fell below an objective standard of reasonableness, a convicted defendant also must demonstrate that counsel's performance prejudiced the outcome of his trial or sentencing. To do so, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. And, if a defendant's conviction was the result of a trial, he "must demonstrate that but for counsel's errors, there is a reasonable probability that he would not have been convicted." Lee v. Clarke, 781 F.3d 114, 122-23 (4th Cir. 2015), as

amended (Apr. 15, 2015) (quoting United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010))

(internal quotation marks omitted).

## B.     Diminished Mental Capacity Defense (Claim II)

In this Claim, Morgan asserts that trial counsel were ineffective for failing to investigate,

prepare, and present a diminished mental capacity defense at trial.  (Am. Pet. 5-9, Doc. No. 56).

This claim was not raised on direct appeal or during state post-conviction proceedings.  It is

unexhausted, and if Morgan returned to the state courts and attempted to exhaust it now, the

claim would be procedurally barred.  See N.C. Gen. Stat. § 15A–1419(a).  As such, the claim is

procedurally defaulted.  See Beard, 134 F.3d at 619.  Morgan argues ineffective assistance of

state post-conviction counsel as cause for his failure to exhaust this claim in the state courts.  See

Fowler, 753 F.3d at 461 (citation omitted).

"The elements of first-degree murder are: (1) the unlawful killing, (2) of another human

being, (3) with malice, and (4) with premeditation and deliberation."  State v. McDowell, 715

S.E.2d 602, 609 (N.C. Ct. App. 2011) (citations omitted).  First-degree murder is a specific intent

crime, which means the State must prove a defendant intended to kill his victim.  State v. Coble,

527 S.E.2d 45, 47 (N.C. 2000); State v. Keel, 423 S.E.2d 458, 462 (N.C. 1992) ("To show the

'specific intent to kill' required to prove first-degree murder, the State must show more than an

intentional act by the defendant resulting in the death of the victim; the State also must show that

the defendant intended for his action to result in the victim's death.").  A defendant's diminished

mental capacity at the time of the offense may "negat[e] the 'ability to form the specific intent to

kill required for a first-degree murder conviction on the basis of premeditation and

deliberation.'"  State v. Roache, 595 S.E.2d 381, 407 (N.C. 2004) (quoting State v. Page, 488

S.E.2d 225, 231 (N.C. 1997)).  Because diminished capacity negates only the element of specific

intent, the defendant could still be found guilty of second degree murder.  State v. McPherson, 567 S.E.2d 466 (N.C. App. 2002). [3]  "Diminished mental capacity may be due to intoxication, disease, or some other cause."  State v. Cooper, 213 S.E.2d 305, 320 (N.C. 1975).

Morgan contends that trial counsel failed to investigate "indications from various and reliable sources that at the time of the offense [he] suffered from organic brain damage and long-term, mind-altering drug addiction, and that he acted while under the influence of cocaine and alcohol." (Am. Pet., supra, at 5).[4]  Had they investigated, Morgan insists, counsel would have discovered that he suffered multiple head injuries prior to the murder of King.  They also would have discovered that his addiction to alcohol and cocaine began in early adolescence; that he was exposed to violence and physical abuse at the hands of his father, and that he was high on crack cocaine and intoxicated at the time of the murder.  (Am. Pet., supra, at 5-9)

Morgan also labels trial counsel's "fail[ure] to engage a mental health expert to evaluate [him] and his social and medical history to prepare and present a diminished capacity defense" as objectively unreasonable.  (Am. Pet., supra, at 9)  He contends that a neuropsychologist, such as Dr. Kristin Herfkens, PhD, who was hired by post-conviction counsel to evaluate Morgan, could have testified at trial that Morgan suffered from severe neurocognitive impairments consistent with moderate to severe brain injury, exacerbated by years of substance abuse, particularly as an adolescent, and exposure to chronic physical abuse and violence, which weakened his ability to

---

[3] "Second-degree murder is the unlawful killing of another human being with malice, but without premeditation and deliberation."  State v. Robbins, 309 S.E.2d 188, 775 (N.C. 1983).  "The intent necessary to support a conviction for second-degree murder is the intent to inflict the wound which produces the homicide."  State v. McNeill, 485 S.E.2d 284, 287 (N.C. 1997).

[4] To support this claim, Morgan relies upon the same evidence that he presented in state post-conviction proceedings to support his claim that trial counsel were ineffective in failing to investigate and present a mental health mitigation defense at sentencing.  (Am. Pet. 9-23, Doc. No. 56 (citing MAR, Doc. Nos. 1-1 through 3-5))  A summary of Morgan's post-conviction evidence can be found in this Court's Order granting Respondent summary judgment and denying Morgan's original Petition for Writ of Habeas Corpus.  (Order 11-17, Doc. No. 33)

read social cues and non-verbal behavior, use good judgment, exercise self-control, understand complex, quickly-developing situations, control impulsivity, and anticipate consequences. (Aff. of Dr. Kristine Herfkens ¶¶ 15, 40, 43, 48, MAR Ex. 4, Doc. No. 2) The expert could have rendered an opinion at trial that due to the effects of traumatic brain injury, exposure to childhood abuse and violence, chronic alcohol dependence, and acute intoxication, Morgan "was unable to inhibit his impulses, appreciate the criminality of his actions and conform his conduct to the requirements of the law" at the time of King's murder. (Herfkens Aff., supra, at ¶ 53)

In discussing claims that an attorney failed to investigate possible defenses, the Strickland Court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" Id. at 690. Whereas, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id. at 691.

Assuming that opinions such as Dr. Herfkens's, if presented at trial, would have been sufficient to entitle Morgan to a jury instruction on diminished mental capacity, Morgan has not demonstrated that trial counsel's decision to forgo a diminished mental capacity defense was based upon an inadequate investigation or was unreasonable under the circumstances. In initial conversations with Morgan and his family, counsel learned that Morgan's family attributed his

longstanding behavioral and perceived mental problems to a head injury he suffered after falling

from the back of a moving car at age nine, and that Morgan may have suffered additional head

injuries during his lifetime.  (Aff. of Faye Burner, MAR Ex. 28, Doc. No. 3-1)  From Morgan,

and through discovery, counsel knew that he smoked crack cocaine and consumed malt liquor in

the hours leading up to the crime.  Finally, Morgan provided his version of what happened on the

night of the murder.  Those initial conversations with Morgan and his family yielded at least

three possible defenses for further investigation – diminished mental capacity, diminished

capacity based on voluntary intoxication,[5] and self-defense.

"[I]n pursuit of documentation of . . . Morgan's head injuries," counsel began gathering

Morgan's medical records shortly after appointment.  (Burner Aff., supra, at ¶ 5; Requests for

Medical Records, MAR Ex. 26, Doc. No. 3)  Counsel also obtained copies of Morgan's 1976

Probation Division Presentence Report (MAR Ex. 7, Doc. No. 2-1), 1976 Presentence Diagnostic

Committee Report (MAR Ex. 14, Doc. No. 2-2), and other North Carolina Department of

Correction records.  (Aff. of Stan Young ¶¶ 10, 15, MAR Ex. 30, Doc. No. 3-1)  These

documents contained information about Morgan's social history, psychological development,

and long history of substance abuse.  Additionally, counsel interviewed family members about

Morgan's childhood, social history, substance abuse, and behavioral problems.  (Aff. of Bruce

Elmore ¶¶ 13, 16, MAR Ex. 35, Doc. No. 3-2; MAR Ex. 36, Doc. No. 3-2)

---

[5]"Voluntary intoxication" can be a form of diminished capacity.  To be entitled to a jury instruction on diminished
capacity based upon voluntary intoxication there must be evidence that at the time of the crime, "the defendant's
mind and reason were so completely intoxicated and overthrown" that he could not form the specific intent required
for a first-degree murder conviction on the basis of premeditation and deliberation.  State v. Gerald, 284 S.E.2d 312,
318–19 (N.C. 1981).  Morgan does not claim that counsel were ineffective for failing to investigate and present a
defense of diminished capacity based upon voluntary intoxication.  (Pet'r's Resp. to Summ. J. Mot. 9-10, Doc. No.
60) ("Morgan's claim is not premised on trial counsel's failure to pursue a defense of voluntary intoxication.
Diminished capacity and voluntary intoxication are two different legal principals.")).

Counsel ran into an immediate problem in their investigation, however, when they were unable to obtain medical records documenting any head injury suffered by Morgan as a child or adolescent.[6]  Nevertheless, on August 18, 1998, counsel wrote to neuropsychologist Claudia Coleman, PhD., inquiring whether she was available to perform a neuropsychological examination of Morgan while he was at Dorothea Dix Hospital.[7]  (Andres Letter to Coleman, MAR Ex. 32, Doc. No. 3-1)  Counsel informed Coleman that Morgan claimed a history of head injuries that they had been unable to document with medical records and inquired whether she could proceed without the records.  (Andres Letter, supra)  Coleman was unavailable to evaluate Morgan (Young Aff., supra, at ¶ 5), and the record is silent regarding whether she would have been willing to proceed without medical records, had she been available.

On April 15, 1999, counsel moved for funds to hire a psychologist to evaluate Morgan. Although they sought an initial authorization of $5,000.00, the trial court authorized only $1,500.00.  (Elmore Aff., supra, at ¶ 14)  Consequently, the psychologist counsel had approached to serve as an expert, declined to accept appointment to the case.  (Elmore Aff., supra)

Counsel immediately thereafter obtained the services of Dr. Mark Worthen, an experienced forensic psychologist.  (Timesheet of Bruce Elmore:  Entry Dates 4/15/99 and 4/16/99, MAR Ex. 44, Doc. No. 3-5)  Among other tasks, counsel requested that Dr. Worthen

---

[6] Records received from Memorial Mission Hospital in Asheville, North Carolina, included treatment Morgan received for a 1990 head injury while he was in custody at the Buncombe County Detention Center but nothing related to treatment of any other head injury.  (Aff. of Bruce Elmore ¶ 15, MAR Ex. 35, Doc. No. 3-2)  Trial counsel considered this incident to be "fairly innocuous" (Elmore Aff., supra) and Dr. Herfkens does not mention this injury in her affidavit (Aff. of Dr. Kristine Herfkens, MAR Ex. 4, Doc. No. 2).  Counsel also requested records from the Medical College of Georgia ("MCG") where Morgan purportedly had been treated for a head injury.  (Request for Medical Records 26, MAR Ex. 26, Doc. No. 3)  MCG was unable to identify Morgan as ever having been a patient. (Letter from MCG 27, MAR Ex. 26, Doc. No. 3)

[7] On August 17, 1998, the trial judge acted on an ex parte letter Morgan had written in January of that year and, over Morgan and his attorneys' objections, ordered that he be committed to Dorothea Dix Hospital for an evaluation to determine whether he was competent to stand trial.  (Pretrial Mot. Hr'g Tr., Aug. 17, 1998).

assess Morgan's mental status at the time of the offense.  (Aff. of Mark Worthen ¶ 10, MAR Ex. 33, Doc. No. 3-1)  Because of Morgan's extensive substance abuse history and reported head injuries, Worthen determined that such an assessment would require one or more interviews with Morgan, a review of available records, and a neuropsychological screening to determine whether a subsequent neuropsychological evaluation would be necessary.  (Worthen Aff., supra, at ¶ 12(b))  Around the same time, counsel made another attempt to obtain Morgan's childhood medical records from Memorial Mission Hospital in Asheville but was told that due to their age, they could not be produced.  (Elmore Aff., supra, at ¶ 15)

In May, counsel moved for additional funds, beyond the $1,500.00 previously authorized, to compensate Worthen.[8]  (Mot., MAR Ex. 33, Doc. No. 3-1).  Worthen provided a cost estimate for his time based upon the number of hours he anticipated it would take him to conduct a comprehensive evaluation, prepare for trial, and testify.  (Worthen Aff., supra, at ¶ 17)  On May 26, the court approved substantially less in additional funds than Worthen estimated was necessary to provide all of the services counsel had requested of him.[9]

Thereafter, Worthen "conducted a limited assessment of . . . Morgan."  (Elmore Aff., supra, at ¶18)  On June 6, 1999, counsel met with Worthen for six hours.  (Time Sheet of Stan Young: Entry Date 6/6/99, MAR Ex. 34, Doc. No. 3-5; Elmore Time Sheet, supra, Entry Date

---

[8] The copy of the motion for additional funds, which was Exhibit 33 of Morgan's MAR, does not have a file stamp or an exact date.  (Motion 3, Doc. No. 3-1).

[9] There is a conflict in the record regarding the amount authorized by the trial court.  According to Stan Young's affidavit, the court authorized an additional $2,500.00.  (MAR Ex. 30 ¶ 12, Doc. No. 3-1)  According to Bruce Elmore, the additional amount was $6,000.00.  (MAR Ex. 35 ¶18, Doc. No. 3-2)  Regardless, both amounts were substantially less than the amount ($11,200.00) Worthen estimated would be needed to fully compensate him for his time on the case.  (Aff. of Mark Worthen ¶ 17, MAR Ex. 33, Doc. No. 3-1)

6/6/99)  Two days later, counsel informed the prosecutor and the trial court that they did not intend to call a mental health expert to testify at either trial or sentencing, although they reserved their right to change that decision.  (Pretrial Mot. Hr'g Tr. 77, June 8, 1999, Doc. No. 62)

"The diminished capacity defense . . . requires proof of an inability to form the specific intent to kill."  State v. Phillips, 711 S.E.2d 122, 138–39 (N.C. 2011) (quoting State v. Cooper, 213 S.E.2d 305, 320 (N.C. 1975) (internal citations omitted), overruled in part on other grounds by State v. Leonard, 266 S.E.2d 631, 636 (N.C. 1980)).  "The production of evidence that a defendant suffers from intoxication, substance abuse, emotional stress, or mental illness does not automatically entitle him or her to an instruction on diminished capacity, absent some evidence that these conditions impacted the defendant's ability to form the specific intent to kill."  State v. McDowell, 715 S.E.2d 602, 609 (N.C. Ct. App. 2011) (citations omitted).  In other words, the crucial issue is not whether the defendant was intoxicated, mentally ill, or under emotional stress at the time of the killing; it is "whether there is evidence tending to show the effect of his condition upon his ability to premeditate, deliberate, and form a specific intent to kill."  Id. at 610.  A successful diminished mental capacity defense based upon the neurocognitive impairments Morgan claims – brain damage, caused by one or more traumatic brain injuries and exacerbated by long-term substance abuse, combined with acute intoxication – would have required expert opinion and testimony.

The letter to Dr. Coleman (MAR Ex. 32, Doc. No. 3-1), and Dr. Worthen's affidavit (Aff., supra, at12(b)), indicate counsel were aware that a neuropsychologist was the appropriate expert to determine if Morgan had brain damage and the extent of any related neurocognitive impairments.  Despite repeated, reasonable attempts, however, counsel were unable to obtain medical documentation of Morgan's head injuries, and it is evident from the record that the

absence of medical records played a role in counsel's strategic thinking. As noted, they initially approached Dr. Coleman with a query regarding her ability to evaluate Morgan without medical documentation of his head injuries. Subsequently, counsel hired a forensic psychologist, knowing that he was not qualified to conduct a neuropsychological examination. (Elmore Aff., MAR Ex. 35 at ¶19; Worthen Aff. ¶ 12(b)(ii), MAR Ex. 33.)

Unlike trial counsel, state post-conviction counsel were able to obtain Morgan's 1964 medical records from Memorial Mission Hospital showing treatment for a head injury Morgan suffered at age nine when he fell from the back of a moving car and was unconscious for about 30 minutes.[10] (Herfkens Aff. ¶ 24, MAR Ex. 4, Doc. No. 2.) Dr. Herfkens relied on those records to support her finding that Morgan suffered a traumatic brain injury ("TBI"). (Herfkens Aff., supra, at ¶¶ 24, 46.) According to Herfkens, this TBI caused neurocognitive impairments that were exacerbated by subsequent concussions, for which she had only anecdotal evidence, long-term substance abuse, and exposure to childhood violence. (Herfkens Aff., supra, at ¶¶ 46, 49, 53.)

Morgan has provided no evidence that Dr. Herfkens, Dr. Coleman, or any other neuropsychologist would have been willing to render an opinion at trial that brain damage caused by TBI and compounded by other factors impaired Morgan's ability to form the specific intent to kill without some medical evidence documenting one or more serious head injuries. Furthermore, even if a neuropsychologist was willing to testify to having reached such a

---

[10] The fact that post-conviction counsel were able to obtain these records in 2005-2006, while trial counsel in 1998-99 were not, is not dispositive of whether counsel performed deficiently. Counsel's actions are assessed in light of the totality of the circumstances at the time the performance was rendered, Strickland, 466 U.S. at 690, and Morgan has offered no evidence or argument that trial counsel's repeated efforts to obtain those records fell below an objective standard of reasonableness.

conclusion, it would not have been outside the wide range of reasonably competent assistance for an attorney to choose a viable alternative defense that was as strong, or stronger. See Strickland, 466 U.S. at 689 (acknowledging that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way"). Counsel had a viable self-defense theory based upon Morgan's version of events, the presence of Patrina King's fingerprint on a broken beer bottle found near her body (Trial Tr. 1160-61, June 29, 1999, Doc. No. 62-9), the fact that King, like Morgan, was high on cocaine during the fighting inside and outside the house (Trial Tr. 1387-88, June 30, 1999, Doc. No. 62-11), and other physical evidence that matched Morgan's version of events. Moreover, the death of Kenneth Cato, the State's only witness to the events leading up to King's murder, meant that he would not be available to rebut Morgan's version of events.

Morgan does not contend that a trial strategy based on self-defense was not viable in his case. Nor does he assert that trial counsel should have presented a diminished mental capacity defense instead of self-defense. Rather, his argument appears to be that counsel should have presented a diminished mental capacity defense in addition to self-defense. (Resp. to Summ. J. Mot. 6, Doc. No. 60) ("[T]he defenses of diminished capacity and self-defense are not mutually exclusive; they are not inconsistent with each other. Both acknowledge a defendant may have committed the acts constituting the crime, but both offer a justification or explanation for this conduct. Thus, trial counsel can pursue both defenses[.]"))

Even if diminished mental capacity was a viable defense under the circumstances trial counsel faced, Morgan has not articulated why reasonable counsel would have presented it along with a theory of self-defense. The purpose of a diminished mental capacity defense is to "raise a reasonable doubt . . . as to whether the defendant had the ability to form the necessary specific

intent" to kill required for a first-degree murder conviction on the basis of premeditation and deliberation.  State v. Garcia, 621 S.E.2d 292, 297-98 (N.C. Ct. App. 2005) (citing State v. Clark, 377 S.E.2d 54, 64 (N.C. 1989)).  By claiming self-defense to a murder charge, on the other hand, a defendant admits that he intentionally killed the victim "but that he did so justifiably to protect himself from death or great bodily harm."  State v. Ray, 261 S.E.2d 789, 797 (N.C. 1980); see also State v. Bush, 297 S.E.2d 563, 569 (N.C. 1982) ("[B]efore [a] defendant is entitled to an instruction on self-defense, two questions must be answered in the affirmative:  (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable?").

Thus, unlike diminished mental capacity, which renders a defendant incapable of formulating the requisite state of mind, self-defense "presumes such state of mind to exist but offers a legally recognizable justification for the conduct."  United States v. Williams, 163 F.R.D. 249, 250 (E.D.N.C. 1995).  In other words, a viable self-defense claim to first-degree murder requires not only that the defendant had the mental capacity to form the specific intent to kill, but that he actually formed that intent.  Therefore, contrary to Morgan's assertion, proceeding on a diminished mental capacity defense and self-defense would have meant presenting inconsistent, or even contradictory, theories to the jury.

That is not to say that evidence of the effects of brain damage, mental illness, or level of intoxication at the time of the offense are irrelevant to the state of mind of a defendant claiming self-defense.  On the contrary, such evidence could be highly relevant in a case where there is

evidence that the defendant used excessive force.[11] In this case, trial counsel contacted Dr. Coleman a second time, not to seek a neuropsychological exam for Morgan, but to discuss whether Morgan could have been experiencing "cocaine rage" – a mental state that can result from combining cocaine and alcohol – at the time of the murder.[12] (MAR Exs. 41, 42, Doc. No. 3-3) At trial, counsel elicited testimony from Dr. Jason, the forensic pathologist, that ingestion of cocaine can cause paranoia, excitement, rapid heartbeat, and an altered perception of reality. (Trial Tr. 1387-88, June 30, 1999, Doc. No. 62-11) There was ample evidence presented at trial that Morgan was under the influence of cocaine and alcohol on the night of the murder, and it would have been reasonable for counsel to presume that jury members would not need an expert to explain that the ingestion of cocaine and alcohol can affect someone's ability to make rational decisions and control negative impulses.

Morgan's claim, however, is not that trial counsel were ineffective for failing to present state-of-mind evidence to the jury; it is that counsel were ineffective for failing to present that evidence as part of a diminished mental capacity defense to "negate[ ] a required element of first degree murder." (Am. Pet. 8, Doc. No. 56) He has not demonstrated why reasonable counsel would risk confusing or alienating the jury by offering inconsistent defense theories.

---

[11] "There are two types of self-defense: perfect and imperfect. Perfect self-defense excuses a killing altogether, while imperfect self-defense may reduce a charge of murder to voluntary manslaughter." State v. Revels, 673 S.E.2d 677, 681 (N.C. Ct. App. 2009) (citation and internal quotation marks omitted). An instruction on imperfect self-defense should be given when there is evidence that a defendant "reasonably believes it necessary to kill the deceased to save himself from death or great bodily harm even if defendant (1) might have brought on the difficulty, provided he did so without murderous intent, and (2) might have used excessive force." State v. Mize, 340 S.E.2d 439, 441–42 (1986) (citations and quotation marks omitted). "Voluntary manslaughter occurs when one kills intentionally, but does so in the heat of passion aroused by adequate provocation or in the exercise of self-defense where excessive force is used or defendant is the aggressor." State v. Lassiter, 586 S.E.2d 488, 497 (N.C. Ct. App. 2003).

[12] This conversation took place on June 10, 1999, after counsel had decided not to present expert mental health testimony at trial. (Pet'r's Exs. 41, 42, Doc. No. 3-3)

In sum, it would not have been unreasonable for counsel to abandon further investigation of a diminished mental capacity defense after reasonable efforts to obtain medical documentation of a traumatic brain injury failed.  See e.g., Wiggins v. Smith, 539 U.S. 510, 522-23 (2003) (focusing on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*") (emphasis in original)).  To the extent they still were inclined to pursue an outside neuropsychological screening or evaluation after hiring Dr. Worthen, it would have been reasonable for trial counsel to abandon that plan after the court authorized less than counsel requested for Dr. Worthen's services.  See Richter, 131 S.Ct. at 789 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.") (citations omitted).

To overcome procedural default under Martinez, a petitioner must demonstrate that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the [petitioner] must demonstrate that the claim has some merit."  132 S.Ct. at 1318.  Here, Morgan has not demonstrated that his claim of ineffective assistance of counsel is substantial.  As such, his claim is procedurally defaulted, and Respondent is entitled to summary judgment.

### C.    Diminished Capacity Instruction (raised as Claim III)

In this Claim, Morgan contends that trial counsel were ineffective for failing to request an instruction on diminished mental capacity based upon evidence of impairment presented at trial.  (Am. Pet. 24-30, Doc. No. 56)  Both parties agree that the substance of Claim III was not raised on direct appeal or in state post-conviction collateral proceedings.  Morgan argues ineffective assistance of state post-conviction counsel as cause for his failure to exhaust this claim in the state courts.  Respondent contends, however, that Morgan was in a position to raise this claim on

direct appeal and that pursuant to <u>Fowler</u>, 753 F.3d. at 463, <u>Martinez</u> does not apply.

In order to succeed on the merits of this claim, Morgan must demonstrate that counsel's failure to request a diminished mental capacity instruction based upon the evidence presented at trial fell below an objective standard of reasonableness, and but for counsel's failure, there is a reasonable probability that Morgan would not have been convicted of first-degree murder.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689, 694.  Morgan cannot demonstrate that counsel were ineffective under <u>Strickland</u>, without first establishing that he would have been entitled to a diminished mental capacity instruction had one been sought.  <u>See</u> <u>United States v. Luck</u>, 611 F.3d 183, 189 (4th Cir. 2010) ("Our inquiry regarding the prejudice prong is twofold: (1) whether the instruction, if requested, should have been given; and (2) if the instruction had been given, was there a reasonable probability that the outcome of the proceedings would have been different.").

A diminished mental capacity instruction is required "where the evidence of the defendant's mental condition is sufficient to raise a reasonable doubt in the mind of a rational trier-of-fact as to whether the defendant had the ability to form the necessary specific intent to commit the crimes for which he is charged."  <u>State v. Garcia</u>, 621 S.E.2d 292, 297-98 (N.C. App. 2005) (citing <u>State v. Clark</u>, 377 S.E.2d 54, 64 (N.C. 1989)).  At trial, Morgan produced evidence that in the hours leading up to the murder, he smoked crack cocaine with Cato; drank a 40 ounce malt liquor beer; split two 40 ounce malt liquor beers and smoked crack with King; split another 40 ounce beer with Cato and King; and smoked some crumbs of crack.  After Morgan smoked the crumbs, King hit him over the shoulder with a bottle and Cato put him in a chokehold and held a gun to his head.  Morgan attempted to defend himself by hitting Cato in the head with a bottle.  He then picked up a knife and chased Cato outside.  Subsequently, King hit Morgan again with a bottle, causing him to "see stars," and they began to fight in the middle of

the street, she with a bottle as a weapon, and he with a knife.  He denied any memory of stabbing King.  (Trial Tr. 1550-67, Doc. No. 62-12)  Additional evidence showed that ingestion of cocaine can cause paranoia, excitement, rapid heartbeat, and an altered perception of reality.  (Trial Tr. 1387-88, Doc. No. 62-11)

Taken in the light most favorable to Morgan, the evidence presented tended to show that he was intoxicated, high, confused, and under emotional stress at the time of the murder.  The evidence also tended to show that when he and King began fighting in the street, Morgan believed he was in physical danger.

As noted, "[t]he production of evidence that a defendant suffers from intoxication, substance abuse, emotional stress, or mental illness does not automatically entitle him or her to an instruction on diminished capacity, absent some evidence that these conditions impacted the defendant's ability to form the specific intent to kill."  McDowell, 715 S.E.2d at 609 (citations omitted).  Thus, evidence that a defendant committed a homicide because he had "an irrational view of the situation in which he found himself does not establish that he could not form the requisite mental state necessary for guilt of first degree murder."  Id. at 611.  Evidence that Morgan was drunk, high, and under emotional stress would not, therefore, entitle him to an instruction on diminished mental capacity, absent sufficient evidence that those conditions impaired his ability to form the specific intent to kill.  See id. at 609, 611.

The only evidence that arguably showed the effect of intoxication and emotional distress upon Morgan's ability to form a specific intent to kill King was his self-serving testimony that he could not remember stabbing King because everything "just happened so fast" (Trial Tr. 1565-66, Doc. No. 62-12).  The Court finds that this evidence was insufficient to raise a reasonable doubt in the mind of a rational trier-of-fact that Morgan had the ability to form the necessary

24

specific intent to kill Patrina King.  See e.g., McDowell, 715 S.E.2d at 610-11 (holding that defendant was not entitled to an instruction on diminished capacity based on the testimony of psychiatrists that defendant suffered from post-traumatic stress disorder, post-concussive syndrome, alcohol abuse, and some degree of cognitive impairment, where psychiatrists did not testify as to how defendant's conditions would impair his ability to form an intent to kill); State v. Staten, 616 S.E.2d 650, 658–59 (N.C. Ct. App. 2005) (holding that defendant was not entitled to diminished capacity instruction where, despite evidence that the defendant was mentally retarded, had been diagnosed with paranoid schizophrenia, and operated under a delusional belief system, there was no evidence that he did not have the specific intent to commit armed robbery); State v. Lancaster, 527 S.E.2d 61, 66–67 (N.C. Ct. App.) (holding that evidence of the defendant's drug addiction and testimony that drug use "could have had a negative impact" on his ability to plan did not entitle him to instruction on diminished capacity), review allowed in part for the limited purpose of a remand to the Court of Appeals and denied in part, 545 S.E.2d 723 (N.C. 2000).  Accordingly, the Court concludes that Morgan was not entitled under North Carolina law to an instruction on diminished mental capacity based upon the evidence presented at trial.

Because Morgan was not entitled to an instruction on diminished mental capacity, trial counsel could not have performed below an objective standard of reasonableness by failing to seek one.  Cf. Lee, 781 F.3d at 123-25.[13]  Moreover, had counsel sought a diminished mental

---

[13] Morgan argues that his claim is indistinguishable from that of the defendant in Lee v. Clarke, 781 F.3d 114 (4th Cir. 2015.  In Lee, the court held that defense counsel's failure to request an instruction defining one of the elements of voluntary manslaughter ("heat of passion") fell below an objective standard of reasonableness because: 1) Lee was entitled to the instruction; 2) based upon the facts presented at trial a reasonably competent attorney would have requested the instruction; and 3) defense counsel had no strategic reason for failing to request the instruction.  Id. at 123-25.  Lee was entitled to the instruction because he met the evidentiary burden required under Virginia law.  Id. at 123-24 (citing McClung v. Commonwealth, 212 S.E.2d 290, 293 (VA 1975) (holding that a defendant who

capacity instruction, it would not have been given.  See e.g., McDowell, 715 S.E.2d at 610-11.

Accordingly, Morgan cannot demonstrate that he was prejudiced by counsel's failure to seek the

instruction.  See Luck, 611 F.3d at 189 (holding that prejudice inquiry requires, in part, a

determination whether instruction, if requested, should have been given).  Furthermore, Morgan

has not articulated why reasonably competent counsel would have requested a diminished mental

capacity instruction after presenting a self-defense theory to the jury and obtaining instructions

on self-defense and voluntary manslaughter.  See discussion of Claim II, supra, at 19-20.

Morgan has not demonstrated that this ineffective assistance of counsel claim is a

substantial one.  See Martinez, 132 S.Ct. at 1318.  As such, his claim is procedurally defaulted,

and Respondent is entitled to summary judgment.

The Court also finds that this claim could have been raised on direct appeal in the North

Carolina Supreme Court.  See Fair, 557 S.E.2d at 524 (Claims "brought on direct review will be

decided on the merits when the cold record reveals that no further investigation is required, i.e.,

claims that may be developed and argued without such ancillary procedures as the appointment

of investigators or an evidentiary hearing.").  All of the evidence the court needed to determine

whether Morgan was entitled to a diminished mental capacity instruction was in the record

before it.  As Morgan was not entitled to such an instruction, there would have been no need for

an investigation of counsel's reasons for not seeking the instruction.  Furthermore, all of the

---

produces "some credible evidence that he acted in the heat of passion," is entitled to an instruction on manslaughter)
(emphasis added); Belton v. Commonwealth, 104 S.E.2d 1, 4-5 (VA 1958) (concluding that where there was ample
evidence at trial of heat of passion, the trial court should have given an instruction defining heat of passion and
distinguishing heat of passion from malice)).  Morgan, on the other hand, failed to meet the evidentiary burden
required to warrant an instruction on diminished mental capacity under North Carolina law.  See discussion, supra,
at 23-24 (citing Garcia, 621 S.E.2d at 297-98 ("An instruction on diminished capacity is warranted where the
evidence of the defendant's mental condition is sufficient to raise a reasonable doubt in the mind of a rational trier-
of-fact as to whether the defendant had the ability to form the necessary specific intent to commit the crimes for
which he is charged.")).

evidence the court needed to assess whether Morgan was prejudiced by the lack of a diminished capacity instruction was in the record before it.

Direct appeal, not state collateral review, was the initial review proceeding for this ineffective assistance of counsel claim. See <u>Fowler</u>, 753 F.3d. at 463. For this reason also, the <u>Martinez</u> exception does not apply, see <u>id.</u>, and Respondent is entitled to summary judgment on this claim.

### D. Expert Testimony at Sentencing (raised as Claim IV)

Morgan claims that trial counsel were ineffective for failing to investigate, obtain, and present available expert testimony to the sentencing jury about his ability to adjust to life in prison without parole and low risk of future dangerousness in prison. (Am. Pet. 31, Doc. No. 56) Both parties contend that the substance of the instant claim was not raised in the state courts and that if Morgan returned and attempted to exhaust it now, his claim would be procedurally barred. Morgan argues ineffective assistance of state post-conviction counsel as cause for his failure to exhaust this claim in the state courts.

In its Order denying <u>Martinez</u> counsel's motion for an expert on prisons and adjustment to incarceration, the Court concluded Morgan had exhausted a claim in the state courts that trial counsel were ineffective for failing to investigate, hire experts, and present mitigating evidence of his positive adjustment to incarceration and low risk of future dangerousness and that the state court had rejected that claim on its merits. (Order 3-4, Doc. No. 55) <u>Martinez</u> does not apply to claims that were properly presented and adjudicated on their merits in the state courts. See <u>Gray v. Zook</u>, 806 F.3d 783, 789 (4th Cir. 2015) ("<u>Martinez</u> permits a petitioner to excuse certain procedurally defaulted ineffective-assistance-of-trial-counsel claims. But if claims are not procedurally defaulted—that is, they were properly presented to the state court—then <u>Martinez</u>

27

does not apply.") (citing <u>Escamilla v. Stephens</u>, 749 F.3d 380, 394 (5th Cir. 2014) (holding that "<u>Martinez</u> does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted")).  Morgan argues that Respondent's concession that the instant claim was not exhausted in the state courts waives the issue of procedural default and frees this Court to address the merits of the claim under <u>Martinez</u>. (Resp. to Summ. J. Mot. 2, Doc. No. 60)

Because the <u>Martinez</u> exception applies to claims "never presented . . . in state court, a federal court considers [the claims] de novo, rather than under AEDPA's deferential standard of review." <u>Gray</u>, 806 F.3d at 789 (citing § 2254(d)).  Claims adjudicated on their merits in the state courts, on the other hand, are subject to AEDPA's deferential standard of review.  <u>See</u> § 2254(d).  "A party cannot waive, concede, or abandon the applicable standard of review." <u>Ward v. Stephens</u>, 777 F.3d 250, 257 n.3 (5th Cir. 2015) (citing <u>Gardner v. Galetka</u>, 568 F.3d 862, 879 (10th Cir. 2009) (holding that "the standard of review under AEDPA cannot be waived by the parties"); <u>Eze v. Senkowski</u>, 321 F.3d 110, 121 (2d Cir. 2003) (noting that AEDPA's § 2254(d) "contains unequivocally mandatory language" and that "if the [state court] adjudicated [a] claim on the merits, we must apply AEDPA deference")) <u>cert. denied</u>, 136 S. Ct. 86 (2015); <u>see also</u> <u>Moss v. Ballard</u>, 537 F. App'x 191, 195 n.2 (4th Cir. 2013) (unpublished) (noting that "the correct standard of review under AEDPA is not waivable") (citations omitted)).  Thus, neither party can "concede" that a fully-exhausted claim that was adjudicated on the merits in the state courts is, nevertheless, unexhausted in federal habeas.  <u>See</u> <u>e.g.</u>, <u>Eze</u>, 321 F.3d at 120–21.  Were it otherwise, a habeas petitioner could evade AEDPA's deferential standard of review and obtain de novo review, and funding to investigate, under <u>Martinez</u> simply by conceding that a claim is unexhausted or by the respondent failing to argue the proper standard of review.

"[T]he court, not the parties, must determine the standard of review." <u>Worth v. Tyer</u>, 276 F.3d 249, 262 n.4 (7th Cir. 2001); <u>see also</u> <u>Brown v. Smith</u>, 551 F.3d 424, 428 & n.2 (6th Cir. 2008) (deciding whether AEDPA deference applies, even though the issue was not raised below, because "a party cannot 'waive' the proper standard of review by failing to argue it"), <u>overruled on other grounds by</u> <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1398 (2011). Here, that determination depends upon whether Morgan exhausted his ineffective assistance of trial counsel claim in the state courts.

For a claim to be exhausted, "both the operative facts and the controlling legal principles must be presented to the state court." <u>Matthews v. Evatt</u>, 105 F.3d 907, 911 (4th Cir. 1997) (quotation marks and citations omitted). The controlling legal principles for an ineffective assistance of counsel claim are articulated in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Morgan's MAR raised an identifiable 6th Amendment claim based upon the principles announced in <u>Strickland</u> and its progeny.

"The exhaustion requirement applies as much to the development of facts material to a petitioner's claims as it does to the legal principles underlying those claims." <u>Winston v. Kelly</u>, 592 F.3d 535, 549 (4th Cir. 2010). "[S]upplemental evidence" presented in a federal habeas claim that does not "fundamentally alter the legal claim already considered by the state courts" will not render the habeas claim unexhausted. <u>Id.</u> (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 260 (1986)) (alteration in the original; internal quotation marks omitted).

In the state courts., Morgan claimed that trial counsel were ineffective for failing to: (1) investigate his positive adjustment to prison and lack of future dangerousness; (2) hire experts to assess the mitigation value of his positive adjustment to prison and lack of future dangerousness, and (3) present that evidence to the jury. (MAR 5-14, Doc. No. 1-3.) The claim was presented

29

in nine pages of allegations, argument, and citations to Morgan's North Carolina Department of Correction[14] ("DOC") records from his 14 years of incarceration for second-degree murder, the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), applicable U.S. Supreme Court cases, an affidavit of one of Morgan's DOC case managers, an affidavit of the defense mitigation investigator, who interviewed another of Morgan's DOC case managers, and an affidavit of a defense mental health expert who provided her opinion of Morgan's risk of future dangerousness in prison, based in part upon his previous positive adjustment to incarceration.

Among the evidence of positive adjustment to prison and lack of future dangerousness identified as reasonably discoverable by trial counsel were Morgan's consistent qualification for decreased levels of security, participation in substance abuse treatment programs, placement on work-release, receipt of weekend passes to spend with his family, and placement on parole. (MAR 5-14, Doc. No. 1-3)  Additional mitigating evidence was Morgan's report of a fellow inmate's escape, and his case-workers' assessment that Morgan was not a trouble-maker.  (Aff. of Noel Nickle, MAR Ex. 22, Doc. No. 3; Aff. of Deborah Hipps, MAR Ex. 23, Doc. No. 3) Morgan's post-conviction mental health expert provided the following assessment of Morgan's risk of future dangerousness:

> Jimmy Morgan is unlikely to present a risk for dangerous behavior in prison.  In the absence of alcohol and drugs, Mr. Morgan has demonstrated an ability to better control his impulses.  He is aware of his issues with his temper, and he has taken steps to avoid conflict.  For example, Mr. Morgan reported that he quit lifting weights and working out to make himself less likely to attract the attention of other inmates looking for a fight.  He "shuns" or ignores other inmates to "punish" them when they make fun of him.  In addition, the rigid structure of prison makes it much likelier that Mr. Morgan will be able to avoid situations that have triggered his temper in the past.  Mr. Morgan has demonstrated an ability to respond to the

---

[14] Now the North Carolina Department of Public Safety.

constant observation by guards and the threat of immediate punishment and loss of privileges by conforming is behavior to what is expected of him in prison. The rigid rules and constant observation are quite different than the world outside prison in which Jimmy might give in to his impulses in the hope that he could avoid consequences. In fact, Jimmy appears to have allied himself with the correctional staff, and sees himself as their entertainer. He appears intrinsically motivated to maintain the good will of the officers because their laughter reinforces Jimmy's belief that he is a star performer. Ironically, the prison setting may provide Jimmy Morgan with his clearest opportunity to have an audience that is appreciative of his entertainment efforts, as most of his peers are anything but entertaining toward the staff.

(Aff. of Kristine Herfkens, PhD. 16-17, MAR Ex. 4, Doc. No. 2)

Morgan does not articulate how his Martinez claim fundamentally alters the ineffective assistance of counsel claim raised in his MAR. The only qualitative difference the Court can discern between the two is that the instant claim identifies the type of expert Morgan believes trial counsel should have hired -- an expert on prisons and adjustment to incarceration. Morgan argues that the mitigating evidence proffered in the MAR "paled in comparison to testimony from an expert on adjustment to incarceration who could have looked at Mr. Morgan's profile, his incarceration history, and his psychological ability to adapt to a life sentence without being a future danger inside the prison system." (Am. Pet. 32, Doc. 56)

The test, however, is not whether the habeas claim is stronger than the one raised in state court. See Winston, 592 F. 3d at 550. It is "whether there was already evidence in the state record from which a fact-finder could reasonably determine the existence of facts essential to the petitioner's claim." See id. If so, the habeas claim does not fundamentally alter the claim raised in the state courts. See id.

In this case, the MAR presented evidence, including expert evidence, from which a rational fact-finder could have found the facts necessary to Morgan's ineffective assistance of trial counsel claim. Thus, the substance of the instant claim was raised during state post-

conviction collateral proceedings. Moreover, it was adjudicated on its merits in the state courts. It, therefore, is not procedurally defaulted and does not fall under the <u>Martinez</u> exception. <u>See</u> <u>Gray</u>, 806 F.3d at 789. Respondent is entitled to summary judgement on this claim.

## IV.    ORDER

**IT IS, THEREFORE, ORDERED** that:

1. The Amended Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 (Doc. No. 56) is **DENIED;**

2. Respondent's Motion for Summary Judgment (Doc. No. 58) is **GRANTED;**

3. The Clerk of Court shall substitute Carlton Joyner for Gerald Branker as Respondent; and

4. Pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, the petitioner must establish both that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right).


Signed: September 7, 2016


Robert J. Conrad, Jr.
United States District Judge